## FIERMAN v. SEWARD NAT. BANK OF NEW YORK.
### No. 16.

Circuit Court of Appeals, Second Circuit.
Dec. 5, 1932.

David W. Kahn, of New York City, for appellant.

Willcox, Swiger, Chambers & Scandrett, of New York City (Frederic L. Clark, of Philadelphia, Pa., and J. Anthony Panuch, of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This suit seeks to set aside a transfer made by the bankrupt to the appellee of a $60,000 demand collateral note. The note was that of the Pennsylvania Hardwood Flooring Corporation, payable to the bankrupt. The corporation's first mortgage bonds, amounting to $150,000, were given as collateral security for the note. The appellant claims that it has established that the transfer of this note to the appellee was a voidable preference under the Bankruptcy Act, § 60a (11 USCA § 96(a).

The bankrupt was engaged in the lumber business, and held the controlling interest in the stock of the Pennsylvania Hardwood Flooring Corporation and all of the stock of the R. S. McConnell Lumber Company and the McConnell Lumber Terminal Corporation. In 1927, the three companies opened banking connections with the appellee, making their arrangements with its vice president, Moak. A line of credit was extended, but all loans were guaranteed by the bankrupt. A like course of business was followed with other banking institutions. In December, 1927, the bankrupt's total liabilities were $330,000; his assets, at that time, consisted of stock in the three corporations and unimproved real estate, part of which was afterward sold for $8,000. The assets of the R. S. McConnell Lumber Company amounted to approximately $2,000, and the assets of the Pennsylvania Hardwood Flooring Corporation were sold for $40,000, subject to a mortgage of $150,000. The McConnell Lumber Terminal Corporation had no other creditors than the appellee, but the

assets were pledged to it, and these were insufficient to pay the loans and advances received from the appellee, amounting to $93,000. The court below found that McConnell was hopelessly insolvent in December, 1927.

Mr. Moak resigned his position with the appellee in October, 1927, and one Fisher joined the appellee on November 23, 1927. At this time Fisher began making an investigation of the various loans made to the bankrupt, and in the course of his investigation examined the accounts of the bankrupt's companies. He decided that the accounts were in bad condition, and early in December sent for one Dimock, an associate of the bankrupt and a man of good reputation, who discussed the affairs of the companies with Fisher. At that time they considered the loans of $93,000, advanced under a revolving letter of credit and under an agreement that warehouse receipts of the lumber purchased with this money would be deposited as security. Although the advances were made in October and November, the promised warehouse receipts were not produced. Mr. Fisher, dissatisfied with his inability to obtain the security promised by way of warehouse receipts, went to Philadelphia for the purpose of calling on the warehouse company and obtaining information. He reached there December 22, 1927, and found that he had not received the receipts because there were unpaid ocean freight charges amounting to $18,000, and that, until this prior lien was satisfied, the warehouse company would not issue receipts. Fisher consulted counsel in Philadelphia and brought McConnell and Dimock from New York to Philadelphia the next day. The warehouse receipts, subject to the lien of the steamship company for unpaid freight charges, were finally obtained, and, upon Fisher's return to New York, a demand was made for further security. Dimock transferred customers' paper to the extent of $20,000 for the purpose of paying ocean freight charges on the lumber, but Fisher retained this paper as general security. Dimock was forced to pay the freight charges to the extent of $16,000 out of other assets. This was done by discounting some customers' paper held by the McConnell companies.

On December 26, Fisher called Dimock at his home, requested him to attend a conference at the bank in the afternoon, and, counsel being present, it was stated that drastic action would be taken to protect the bank. It was suggested that five collateral notes be prepared aggregating approximately $93,000 which had been advanced against the lumber. These notes were dated back to October and November when the moneys had been advanced. The purpose of this was to tie in these notes with the security of $150,000 of bonds of the Pennsylvania Hardwood Flooring Corporation which were in the appellee's custody and for which it had issued a safe-keeping receipt to the bankrupt in July, 1927. These bonds were acquired by the bankrupt in January, 1927, as security for certain advances which he made on behalf of the Pennsylvania Hardwood Flooring Corporation to the extent of $44,000, and he directed a bank in Pennsylvania which held the bonds to send them to the appellee. Upon their receipt, the safe-keeping receipt therefor was issued, and it was in the bankrupt's possession until December, 1927. It appears that McConnell had an agreement with the Pennsylvania Hardwood Flooring Corporation to finance it to the extent of $60,000, for which he was to receive the bonds as security. Fisher then proposed that a note be made for $60,000 to McConnell by the corporation, dating it June 4, 1927, and reciting that, as collateral therefor, there were to be issued the $150,000 of mortgage bonds mentioned. In the effort to obtain this security, Fisher failed to learn that the advances made to the Hardwood Flooring Corporation by the bankrupt were but $44,000, not $60,000, and the note, instead of being made for $44,000, was for the full amount of $60,000. It was then proposed that five notes aggregating $93,000, advanced against the lumber, should in addition to reciting the lumber as collateral also recite the $60,000 note thereafter delivered. It was explained by Fisher that the appellee would thus get as security the $150,000 mortgage bonds. An entry was made in the journal of the R. S. McConnell Lumber Company, under date of December 31, charging bills receivable $60,000 and crediting the Hardwood Flooring Corporation with that amount. A similar entry was made in the ledger on the same date charging notes receivable and crediting the Pennsylvania Hardwood Flooring Corporation. On January 1, 1928, Fisher brought Dimock to appellee's bank. He then expressed his dissatisfaction with the state of the account of the Hardwood Flooring Corporation, which was then indebted to the bank for $26,000 and proposed that in the operation of the company's affairs, there should be submitted each week a budget of what the expenses would be and what could be expected in the

way of collections and sales. Fisher stated that the appellee would make advances necessary to provide for the operation of the plan. A document was then prepared and executed. It turned out to be a bill of sale of all the lumber owned or to be thereafter acquired by the Hardwood Flooring Corporation. No notice was given to other creditors. Appellee then entered the premises, took possession, and posted signs indicating its ownership. It thus acquired every asset of the bankrupt and of his companies, with the exception of uncollectible accounts receivable owned by the bankrupt and the unimproved real estate previously mentioned.

But the appellee claims that the $60,000 note was delivered to it between September 30 and October 3, 1927, thus avoiding the four months' period which gives rise to a presumptive preference, and it attempts to support this claim by the testimony of two witnesses. Drewes was a clerk employed in the foreign and letter credit department of the bank. He said that between September 30 and October 3, 1927, he saw the note clipped to a letter, dated September 30, 1927, written by Dimock to Moak, the former vice president, and a general loan and collateral agreement of the same date. These papers were handed him by Moak when the latter retired from the bank with the remark, "They were additional collateral for the McConnell account." Moak denied this testimony, and stated that he neither asked for nor received up to the time of his resignation the $60,000 note in controversy. An accountant, Aldrich, who made an audit of the bank during the month of October, claimed that the $60,000 note was exhibited to him, and that he listed it on his work sheet, but no book in the bank shows an entry covering this note. Moak said he never saw such a note in the bank. Dimock testified positively that it was made between Christmas, 1927, and New Year, 1928, under the circumstances above described. There were entries in the journal of the R. S. McConnell Lumber Company justifying Dimock's claim. Dimock was a reputable witness with no apparent interest. The bankrupt testified positively that the first he knew of the $60,000 note was in December, 1927. Indeed, Fisher admits that the five notes amounting to $93,000 were made after December 27, 1927. A significant circumstance is that, on the date the $60,000 note was supposed to have been made, June 4, 1927, there were not $60,000 owing by the Pennsylvania Hardwood Flooring Corporation to

McConnell, but only $44,000. The books of the Hardwood Flooring Corporation contain no reference to the issuance of the note as in June. The bonds were held for the bankrupt by the appellee during this period as signified by the safe-keeping receipt. Because of Fisher's part in the transaction, his testimony is not persuasive; nor is that of Drewes and Aldrich. The work sheets produced by Aldrich show the entry of the $60,000 as the last item thereon. Under the heading of security is the $60,000 note. Cross-examination of this witness disclosed contradictions which make it impossible for us to accept his testimony as against the more reliable testimony of Dimock and Moak. There are some circumstances leading to this result. On the top of the work sheet produced on the right-hand side appears a check indicating that it had been examined. Aldrich says that this symbol was employed to indicate collateral which he had personally checked, and that, where this check mark was used, it meant his personal examination. The check mark appears on every item of the work sheet produced with the exception of the last five items, and also appears against the first item on the next page, but does not appear against the $60,000 note in controversy. The witness attempts to explain this in three different ways, none of which is convincing. If the check mark appeared only in one place on top of the second page, there might be some room for the argument that it had been inadvertently omitted from the other items of collateral, but we find that the check mark appears twenty times on the previous page and but once on the second page, and it is absent opposite the item showing the $60,000 note. It is likewise very significant that no reference is made to this $60,000 note in the books of the bank. No mention is made in the auditor's report of this $60,000 note. His work sheets were not submitted to the directors or to the corporation and placing the item thereon is without sufficient explanation.

Fisher's activities and effort to obtain further collateral cause us to look upon his testimony with suspicion. We think the more reliable testimony is that given by Dimock and Moak, both of whom are supported by circumstances which tend more unerringly to point to the truth of the facts giving rise to the making and delivery of the $60,000 note and the possession of the bonds as collateral security. While we reluctantly reverse a decree based upon a finding of fact decided by a trial judge, still, where the

circumstances warrant it, we should not hesitate so to do. Levy v. Weinberg & Holman, Inc., 20 F.(2d) 565 (C. C. A. 2). Under the circumstances shown, a decree should have been entered for the appellant.

Decree reversed.