## LEVY v. WEINBERG & HOLMAN, Inc.

Circuit Court of Appeals, Second Circuit.
July 5, 1927.

No. 272.

1. **Bankruptcy ⬭303(4)—Evidence held to show that creditor, making loan and taking excessive collateral under agreement to apply excess on pre-existing debt, believed preference would result.**

Evidence held to show that creditor, making loan to debtor and taking excessive collateral under agreement that excess might be applied to pre-existing debt, had reasonable cause to believe that preference would thereby be effected.

2. **Bankruptcy ⬭166(2)—Insolvent debtor may give security for past indebtedness, intending preference, without recipient knowing or believing he is receiving preference.**

An insolvent debtor, intending a preference, may give security for past indebtedness without the recipient knowing or having reasonable cause to believe that he is receiving a preference.

3. **Bankruptcy ⬭168—Creditor, receiving unlawful preference in form of merchandise as excessive collateral for debt, held liable for full amount of proceeds of such merchandise, though sale price had not all been paid.**

Where creditor made loan to debtor, taking merchandise as collateral under agreement that proceeds of merchandise in excess of loan might be applied to pre-existing debt, held, creditor, when sued to recover unlawful preference thereby effected, was liable on basis of full amount for which merchandise had been sold, though part of sale price had not been collected.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by William Levy, as trustee in bankruptcy of the North Bay Shippers' Fur-Trading Company, against Weinberg & Holman, Inc. From a decree dismissing the bill, complainant appeals. Decree reversed, and cause remanded, with instructions.

William Levy, as trustee in bankruptcy of North Bay Shippers' Fur-Trading Company, Inc., a corporation, filed his complaint against the defendant corporation to recover voidable preferences pursuant to section 60 of the Bankruptcy Act (Comp. St. § 9644).

The bankrupt and the defendant were both dealers in furs. They had done business together for several years. On January 1, 1923, there was owing from the bankrupt

to the defendant some $7,000 for goods previously purchased. Between January 1 and September 27, 1923, the date when the alleged preferential transfers began, the bankrupt purchased from the defendant some $32,000 worth of goods. The usual course of dealing was for the bankrupt to give the defendant customers' notes and drafts for an amount approximating the purchase price. At the date last mentioned, the bankrupt owed the defendant about $24,800 against which the defendant held the bankrupt's customers' papers for some $21,000. The last purchase from the defendant had been made August 17, 1923.

On September 21, 1923, the defendant was notified that acceptance had been refused on drafts for some $11,000 which it had delivered to a bank for collection. These drafts were drawn upon customers of the bankrupt, and had been previously received by the defendant from the bankrupt on its merchandise account. On September 27, the defendant began an unusual course of dealing with its former customer. Between that date and November 16, 1923, it made a series of loans, on at least ten different dates, aggregating $18,590. For each loan it received collateral of merchandise, or, as in two instances, of customers' notes, substantially in excess of the sum loaned, and with the understanding that such excess, when collected, should be applicable to the prior indebtedness of the bankrupt. The theory of the complaint is that the security so transferred on the occasion of each loan was more than adequate to cover that loan, and was intended to grant the defendant a preference, by permitting it to apply the excess of collateral against its general account. A considerable sum in excess of the loans was realized by the defendant and applied on the bankrupt's indebtedness to it for merchandise. The following tabulation shows the details:

| Date of Loan. | Amount. | Collateral. | Amount Realized. |
|---|---|---|---|
| Sept. 27 | $2,400 | 4,000 squirrel skins | $3,311.25 |
| Oct. 1 | 2,200 | Customers' notes | 3,502.54 |
| Oct. 4 Oct. 11 | 2,850 | Customers' notes | 3,820.60 |
| Oct. 19 Oct. 22 | 1,640 | 1,200 nutria skins | 1,798.55 |
| Oct. 31 | 3,500 | Fox skins | 7,586.91 |
| Nov. 2 | 3,500 | Huth equity | 4,000.00 |
| Nov. 9 Nov. 16 | 2,500 | Fox and wolf skins / Huth equity | 4,914.87 / 3,584.70 |
| | $18,590 | | $32,518.82 |
| | | | 18,590.00 |
| Excess realized above loans | | | $13,928.82 |
| Uncollected item on sale of squirrel skins | | | 500.00 |
| Amount of alleged preference | | | $14,428.82 |

On November 28, 1923, an involuntary petition in bankruptcy was filed. Adjudication and the appointment of the complainant as receiver, and later, as trustee, followed. Such further facts as are essential to the decision will appear in the opinion.

Rosenthal & Heermance, of New York City (S. Michael Ress, of New York City, of counsel), for appellant.

David W. Kahn, of New York City, for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge (after stating the facts as above). [1] To establish the insolvency of the bankrupt the complainant introduced testimony of an accountant, who examined the books of the bankrupt and submitted summaries thereof, which showed insolvency at the date of the petition to the extent of $61,000, and on September 27, 1923, to the extent of $26,000. Although liabilities to merchandise creditors totaled $93,000, the merchandise and fixtures taken over by the receiver were valued at less than $1,000, and were actually sold for about $500. We entertain no doubt that the bankrupt was insolvent on September 27, 1923, and at all subsequent dates in question.

The only real question in the case is whether the defendant had reasonable cause to believe that a preference would be effected when it received from time to time the transfer of collateral, with the understanding that the value realized above the sum then advanced should stand as security for the merchandise account. It was upon the ground that the proof was insufficient in this respect that the bill of complaint was dismissed.

As is usual in such litigation, there was no direct evidence that Weinberg, who acted for the defendant in all the loans, had any knowledge of the bankrupt's financial condition. He denied that, when any of the loans were made, he asked any questions. He could not remember any conversations with the borrower regarding the loans. His answers to questions at the examination in the bankruptcy proceedings in December, 1923, scarcely a month after the final loan, show an evasiveness and a lack of memory not consistent with an honest attempt to explain bona fide transactions. The transparent falsity of his attempt to change his testimony before the referee in bankruptcy, by substituting the word "coats" for "notes," with reference to collateral received for two of the loans, proves him a witness entirely unworthy of

belief in respect to any matter in which a truthful answer might be detrimental to him.

If, when Weinberg learned that drafts received from the bankrupt had been refused acceptance by their drawees, he had gotten collateral from the bankrupt to replace them, it would have been impossible to infer that he knew of the bankrupt's insolvency. To have required the substitution of new collateral for the rejected drafts would have been reasonable conduct, and would have aroused no suspicion. The thing which does arouse suspicion is that the subsequent dealings were not of that simple kind, but were so complete a departure from the former course of dealing, and so covered with and involved in other transactions, that one naturally looks for an explanation. People do not do indirectly what they can do directly, unless they have a motive for the indirection. Weinberg was a dealer in furs, not a money lender, and he has suggested no reason why he should have accommodated the bankrupt to the extent of $18,590 in loans, while selling him no additional goods and while the previous merchandise debt remained unpaid. Within 50 days 10 loans of the aggregate amount above stated were made, and security was taken on which the defendant realized $32,518.82. The actual value of the collateral was supposed by the parties to be considerably greater. The skins were invoiced at much more than they realized, and Weinberg admitted that the Huth equity was thought to be worth nearly $20,000, though it realized only $7,500. It is apparent that Weinberg took far more security than he needed to cover the advances, and that the purpose was to get security upon the pre-existing indebtedness. No other hypothesis will explain such an excess of benevolence theretofore unknown in the relations of the parties. By this means the defendant has reduced the bankrupt's merchandise debt to it to "around $2,000."

Had the bankrupt been endeavoring to raise money for his business, instead of to give a concealed preference, other methods would have been employed. For example, on October 31, 1923, the defendant advanced $3 500 and received as collateral skins invoiced to him at $11,850. These skins Weinberg forthwith pledged with Frederick Huth for an advance of $4,900. The bankrupt had itself had dealings with Huth, and would naturally have pledged the goods with him directly, had raising money been its purpose.

At the time of the unusual transaction above recited, Weinberg says he did not inquire as to the financial condition of the bankrupt. He says the same with respect to the other occasions when the advances were made. The last loan was on November 16, 1923, an advance of $2,500 against collateral which realized $4,900. This was practically the last business transaction of the bankrupt. One sale of skins to a stranger to this litigation for $1,188 was entered on its books November 17th. One transfer of merchandise to the Towas Company as collateral for a loan of $1,250 was made November 27th. When the petition was filed November 28th, the merchandise then remaining in the bankrupt's premises was negligible. It was sold by the receiver for less than $500. In colloquial language, the transfers of collateral to the defendant from September 27th to November 16th had completely cleaned the bankrupt out.

[2] It is, of course, true that an insolvent debtor, intending a preference, may give security for past indebtedness without the recipient knowing or having reasonable cause to believe that he is receiving a preference. And it is argued that because the defendant denies knowledge, and there is no direct testimony to contradict his denial, there is no evidence to support a decree for the complainant. We cannot accept this contention. A creditor may not willfully close his eyes in order to remain in ignorance of his debtor's condition. It is incredible that Weinberg made these loans without any inquiry, if he had no knowledge of the bankrupt's circumstances. His only explanation of why he made them is that the bankrupt asked him to. The unusual character of the transactions, the failure to give any reasonable explanation for the change in the parties' dealings immediately after the nonacceptance of the drafts, the evasiveness and untrustworthiness of Weinberg's testimony, all fit with a purpose to conceal a preference, and are inconsistent with the theory that Weinberg was making advances to a customer believed to be solvent.

The record is sufficiently detailed, so that this court can direct a decree. There is no dispute as to the figures set out in the statement of facts. There is, however, a claim by the defendant that the notes alleged to have been given as security for the two loans made early in October were not so given, that those loans were secured by coats which were later redelivered to the bankrupt in exchange for the Huth equity, and that the notes were obtained in exchange for customers' paper held to secure the general merchandise account. Weinberg's testimony in support of these contentions flatly contradicts his testi-

mony before the referee, which he explains as a mistake. We have already alluded to the transparently false substitution of "coats" for "notes." We give the explanation no credence.

The defendant also argues that as to several of the advances there was no agreement that the excess proceeds of the collateral should be applied upon the merchandise account. This is contrary to the admission in the answer, and to the conduct of the defendant in applying the excess to the merchandise account. But the contention is immaterial, for without such agreement defendant had no right so to apply it and would have to account to the complainant. See Libby v. Hopkins, 104 U. S. 303, 26 L. Ed. 769; Alvord v. Ryan (C. C. A. 8) 212 F. 83; Topas v. Grant (C. C. A. 2) 18 F.(2d) 724.

[3] The value of the property transferred as collateral is shown by what the defendant realized on it. If it was worth more, no proof has been adduced; and the complainant seeks to recover only the amount realized in excess of the sums advanced. Such amount is concededly $13,928.82. But it also appears that the squirrel skins were sold for $3,811.25, although only $3,311.25 was collected. The value of the skins is fixed by the sale price. Therefore the uncollected item of $500 should be added to the $13,928.82 to determine the amount of the complainant's recovery. The decree should therefore be for $14,428.82, with interest from the date of the commencement of the complainant's suit. See Kaufman v. Tredway, 195 U. S. 271, 25 S. Ct. 33, 49 L. Ed. 190.

The decree dismissing the complaint is reversed, with costs, and the cause is remanded, with instructions to enter a decree for the complainant in accordance with the foregoing.