**STANDARD BRANDS, Inc., v. SMIDLER.**
No. 258.

Circuit Court of Appeals, Second Circuit.
Aug. 10, 1945.

It obtained a judgment in the District Court for the Eastern District of New York holding that the defendant had both infringed the mark and competed unfairly. A permanent injunction was issued restraining the defendant from continuing so to do. 56 F.Supp. 665.

The facts were stipulated and may be summarized as follows:

The plaintiff and its predecessors have sold large quantities of canned vegetable juices in New York and in interstate commerce continuously since July 17, 1937. The symbol "V–8" has been put in a prominent position on the cans, which are sold in grocery and delicatessen stores and in the grocery departments of department stores. This combination of vegetable juices has been extensively advertised in magazines and newspapers, on outdoor signs and in other ways under the trade-mark "V–8" and is widely known by that name, though it is also known as a vegetable juice cocktail. The plaintiff makes and sells several other well known food products and also sells dry vitamin tablets in packages bearing its trade-mark "Stams."

The defendant began on July 1, 1942, to sell in New York and in interstate commerce dry vitamin tablets which he bought on the open market and packed in thin elongated cardboard cartons having printed on them, inter alia, a colored disc bearing the symbol "V–8" over the words "Vitamin Tablets" in slightly smaller type. The sentence "These tablets contain 8 vitamins and 3 minerals" in still smaller type was also on the package. The defendant applied for registration of this trade-mark "V–8" for vitamin tablets when he began using it, and for a time used a registration notice with it but discontinued so doing in May of the following year on advice of counsel. His application for registration was denied and he abandoned it, after changing his tablets first from a kind containing three minerals to one containing four and then to another which contained nine minerals and marking his packages accordingly. The defendant sells his vitamin tablets only to drug stores and pharmaceutical dispensaries. When he selected the symbol "V–8" for use on his vitamins he knew "V–8" was being used as a trade-mark for vegetable juices and he also knew that, as the parties have stipulated, the mark had already been used on automobile engines, on brushless shaving cream, and on an after-shave lotion.

Schaines & Liberman, of New York City, for defendant-appellant.

Watson, Bristol, Johnson & Leavenworth, of New York City (Ellis W. Leavenworth, Tracy R. V. Fike, and Franklin M. Depew, all of New York City, of counsel), for plaintiff-appellee.

Before, SWAN, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

The plaintiff, a Delaware corporation, is the owner by assignment of the registered trade-mark "V–8" for a combination of eight vegetable juices. It sued the defendant, a citizen of New York, for infringement of its trade-mark and for unfair competition in the sale of dry vitamin tablets in packages marked with the symbol "V–8".

On March 23, 1943, attorneys for a predecessor of the plaintiff wrote the defendant that the latter's use of "V-8" was considered to be an infringement of the registered trade-mark "V-8" for vegetable juices, and they demanded his discontinuance of such use. They wrote again on April 15, and attorneys for the plaintiff did likewise on July 7; but on advice of counsel the defendant made no reply to any of these letters. This suit was brought on October 15, 1943. On November 5, 1943, the defendant began using cartons bearing a prominent red disc on which "V-8" appeared near the top in large white letters, and has continued such use ever since. Below in smaller letters is the word "tablets." The symbol "m-9" is printed in black lettering about one-fifth the size of "V-8" between the latter and the word "tablets." The lower part of the disc carries in alternate black and white lines the legend "Each tablet contains 8 vitamins and 9 minerals." In this way the defendant has made "V-8" the distinctive part of the mark under which he sells his vitamin tablets, and we shall spend no time discussing the differences between the marks as above described. It is apparent that the "V-8" is the dominant feature of each mark, and for present purposes it must be taken as established that the defendant has used on the containers in which his vitamin tablets are sold the distinctive feature of the plaintiff's registered trade-mark for vegetable juices.

■ The fact that the plaintiff's trade-mark is registered is of no particular significance on this appeal. A valid registration only secures to a registrant, and to his successors, the right to sue for infringement in a federal court, Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 92 F.2d 33, and there is federal jurisdiction in this case anyway because of diversity of citizenship. Yet we agree with the court below that the mark is a non-descriptive one when used on the container of a vegetable juice cocktail. The letter V by itself no more signifies "vegetable" than it does any other word of which it is the initial letter and it is only when resort is had to other parts of the label that one may glean that it stands for "vegetable." As much is true of the figure 8, and when put together as they are in the mark they are only an arbitrary and fanciful symbol chosen to designate the plaintiff's vegetable juice cocktail. This mark has become the distinctive name of that cocktail not because it is inherently descriptive of anything but because it has been so used that it has become associated in the public mind as the banner of that product. That does not make the mark descriptive but is only evidence of the effectiveness of its use. By repeatedly advertising the fact that its cocktail is made of the combined juices of eight vegetables, the plaintiff has undoubtedly taught the purchasing public that "V-8" on a tin can means such a cocktail. Except for this association, we think, no one could reasonably be expected to know that "V-8" designated a vegetable juice cocktail, or any other particular thing for that matter, unless it be something so described by both shape and number, like an eight cylinder automobile engine, for instance, having cylinder blocks set at an acute angle to each other.

■ A trade-mark is not one in gross like a patent right but is a right of user in connection with a trade or business to designate the product to which the mark is applied in that trade or business. It is the use of the mark in a going trade or business to distinguish the product of the user from that of others and not the choice of it which creates what becomes the subject of property in the mark. United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141. Consequently the plaintiff, having established such user, is entitled to be protected from the use of it by others in the same territory on goods which will be thereby confused with its product and likely to be passed off as such. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713. Prior use by another does not necessarily make a mark invalid but only limits the amount of protection to which a trade-mark may be entitled. Treager v. Gordon-Allen, 9 Cir., 71 F.2d 766.

The plaintiff having proved its ownership of a valid trade-mark "V-8" which has become the distinctive symbol of its vegetable juice cocktail within the territory in which the defendant is selling his vitamin tablets under a mark so similar that it must be treated for present purposes as the same mark, the remaining question on this phase of the appeal is whether its use on dry vitamin tablets is an infringement.

■ The plaintiff's cocktail is a food which has been much advertised to be desirable to buy and use because it contains vitamins and minerals. The defendant's

dry vitamin tablets are very different in appearance and however marked could not be mistaken by anyone for liquid vegetable juice, but that fact is a colorless one. The gist of this action for infringement of the plaintiff's mark, just as in the related cause of action for unfair competition, is confusion not as to the kind of product but as to the source of the product. We do not find it necessary to decide whether or not vitamin tablets are properly to be classified as a food in the same category with vegetable juice within the meaning of the registration statute. 15 U.S.C.A. § 85. They are eaten with food and are widely represented to supplement it by the addition of properties essential to health in which the diet of the user may be deficient for one reason or another. It might reasonably be expected that a manufacturer or distributor of food would also make or distribute vitamin tablets. Indeed, it does appear, as already noted, that this plaintiff produces and distributes dry vitamin tablets under the mark "Stams."

 The protection which the law gives the owner of a trade-mark is not confined to the goods upon which it is, or has been, used by the owner of it but extends to products which would be reasonably thought by the buying public to come from the same source if sold under the same mark. Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A. 1918C, 1039; Vogue Co. v. Thompson-Hudson Co., 6 Cir., 300 F. 509; Wall v. Rolls-Royce of America, Inc., 3 Cir., 4 F.2d 333. His mark is the brand by which his goods can be identified, and when it is used by another the reputation of his mark, and consequently his own business reputation, are placed to that extent beyond his control. Unless the use by that other is upon goods so unlike his own or in territory so far from that which he has exploited that it will not create confusion, it will be enjoined. Yale Electric Corp. v. Robertson, 2 Cir., 26 F.2d 972; L. E. Waterman Co. v. Gordon, 2 Cir., 72 F.2d 272.

 The court below found on adequate evidence that the defendant's use of "V–8" was "likely to confuse purchasers or mislead them into the belief that defendant's product is in fact manufactured by plaintiff." Products so closely related in use would naturally be thought to have the same source when they bear the same mark. They are as closely connected as the fountain pens and razor blades of the L. E. Waterman Co. case, supra, or the flashlights and locks of the Yale Electric Corporation case supra, if not more so. The defendant's use of the plaintiff's mark was rightly held to be an infringement and enjoined.

 What has been said respecting infringement applies as well to the cause of action for unfair competition, which is but a somewhat broader phase of the same wrong. The gist of this action is the likelihood that the goods of the defendant will be passed off as those of the plaintiff. Hanover Star Milling Co. v. Metcalf, supra; Lewis v. Vendome Bags, Inc., 2 Cir., 108 F. 2d 16; G. & C. Merriam Co. v. Saalfield, 6 Cir., 198 F. 369.

 The court below did not find specifically that the trade-mark in suit was commonly known to be the plaintiff's mark, but its ownership of it was proved and so was the likelihood that its use by the defendant would cause his goods to be purchased in the belief that their source was the same as that of the plaintiff's vegetable juice cocktail. That made its use by the defendant unfair and unlawful competition with the plaintiff. It was enough that an appreciable number of prospective purchasers were likely to be thus misled. Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955. And it is immaterial that vegetable juices and vitamin tablets do not directly compete with each other. Rosenberg Bros. & Co. v. Elliott, 3 Cir., 7 F.2d 962.

Affirmed.

FRANK, Circuit Judge (concurring).

1. It has often been held that where, as here, the trial court heard no witnesses, all the evidence being stipulated, there is no room for the application of the rule that the trial judge's findings must stand unless "clearly erroneous"; we are in as good a position as he to draw inferences from the record.[1] The issue presented to us, then, unembarrassed by his findings, is this:

---

[1] See, e. g., State Farm Mut. Automobile Ins. Co. v. Bonacci, 8 Cir., 111 F.2d 412, 415; Fleming v. Palmer, 1 Cir., 123 F. 2d 749, 751; Equitable Life Assur. Soc. v. Irelan, 9 Cir., 123 F.2d 462, 464; United States v. Anderson Co., 7 Cir., 119 F.2d 343, 347; United States v. Mammoth Oil Co., 8 Cir., 14 F.2d 705, 716–718; Levy v. Weinberg & Holman, Inc., 2 Cir., 20 F. 2d 565, 567.

Before plaintiff used the symbol "V–8", it had been used by divers others—in selling automobile engines, a shaving-cream and an after-shave lotion. Then plaintiff used it in selling its vegetable-juice, marketed through food-stores and restaurants. Subsequently defendant sold its vitamin tablets, labeled "V–8," marketing them through drug-stores. Meanwhile plaintiff has been selling its own vitamin tablets labeled "Stam," but never "V–8." The record contains no evidence that buyers of defendant's tablets believed that those tablets were manufactured by the maker of "V–8" vegetable-juice. On these facts, has plaintiff acquired so extensive a legal monopoly in the symbol "V–8" that defendant's conduct is unlawful?

With considerable doubt, I agree with my colleagues, in holding that plaintiff has such a monopoly. I shall canvass in some detail the reasons for my doubts because they touch the trunk nerve of the trade-name doctrine, a doctrine which, I think, has been left in much obscurity.

2. I use the word "monopoly" advisedly, because basic in the consideration of cases like this is the fact that judicial protection of any trade name necessarily involves a legalized monopoly which does not—like patents, copyrights or public utility monopolies—rest upon any statute but is entirely judge-made.[2] In the inception of the trade-name doctrine, that fact went largely unobserved. The historical development of that doctrine illuminates the subject:

"Economic liberalism" revolted against certain traditional restraints on "free enterprise," feudal and "mercantilist" restraints, many of which were or purported to be founded on notions of ethics.[3] The revolt centered in a belief—which in the early 19th century became a dogma—that competition, if wholly unhampered by government, would invariably promote the general welfare, and that all monopolies were socially disservicable. This dogma stemmed from Adam Smith's teachings, although he never stated it in an unqualified absolutistic manner.[4] Nor did even those who most enthusiastically endorsed ultra laissez-faire—the policy of complete government neutrality—ever seek to carry it out to its logical extreme—which is anarchism, i.e., the elimination of all property rights in anything other than personal belongings. In practice, the system of let-alone-ism continued to contain many "monopolistic" factors (exclusive privileges) and numerous sorts of governmental "interference" and protective devices.[5] Notable was the protection of property rights,[6] since the legally-protected power of an owner of property to refuse its use to others gives the owner the equivalent of a monopoly, the essence of a monopoly being the legal power (other than as specially limited by government) to exclude others

---

[2] The trade-name monopolies arising under the Federal Trade Commission Act are in a different category.

[3] For a sketch of the movement from "medievalism" through "mercantilism" to laissez-faire, see Hume v. Moore-McCormack Lines, Inc., 2 Cir., 121 F.2d 336; see also my dissenting opinion in Witmark & Sons v. Fred Fisher Music Co., 2 Cir., 125 F.2d 949, 954.

[4] That Adam Smith was not a complete Smithian, see, e.g., J. M. Clark, Adam Smith, 14 Encyc. of Soc. Sciences (1934) 112; J. M. Clark, A Preface to Social Economics (1936), 13–19; J. M. Clark, Social Control of Business (1926), 25–30.

[5] Laissez-faire or "free enterprise" is paradoxical, ambiguous. It contains contradictory elements: (a) It calls for a governmental policy of keeping hands off business. (b) It also calls for unrestricted business competition; but, as competition, if let alone, often yields monopoly (as it did conspicuously in America in the latter part of the 19th century), the maintenance of competition calls for active "enforcement of competition" by government through anti-monopoly proceedings, a policy which, sedulously administered, entails a multitude of interferences and a vast staff of government officials.

This ambiguity in the term "free enterprise" makes it possible for many monopolists today defensively to use that term—by which they mean that government should keep its hands off private monopolies, seeking neither to break them up nor to regulate them.

[6] The English laissez-faire school dealt with certain of the legal rights of Englishmen, developed over the course of centuries, as "natural rights." Important among these rights were property rights. Regarded as "natural," and not as social products, these rights and the protection afforded them by government were not considered "interferences" with the "simple system of natural liberty" which, if government does not intrude, "establishes itself of its own accord."

from its use except upon the owner's terms.[7] Yet unrestrained competition became an article of political-economic faith; and without doubt the courts in the 19th century often, in many ways, gave it practical allegiance.

Fundamental in laissez-faire theory were these assumptions, which were generally accepted by the courts: (1) The economic well-being of consumers is the paramount end of economic activity. (2) Competition will further that end far better than governmental protection.[8] Because of those assumptions, the courts held, as Mr. Justice Holmes pointed out, that "a man has a right to set up a shop in a small village which can support but one of the kind, although he expects and intends to ruin a deserving widow who is established there already."[9] (Significantly, such a man would be held liable if his purpose was not even partially to engage in business com-

[7] In enforcing contracts between persons possessed of unequal economic power, and in preventing intrusions upon "property rights" except with the consent of the owners of those rights, the government, through its judges, sheriffs and police, actively "interferes", i.e., puts the armed force of the community behind important "interferences" with "free" bargaining.

Usually, the legal owner of goods has an enforcible legal power arbitrarily to keep others—no matter how pressing their needs—from obtaining those goods except on his terms. In other words, the government, by protecting property rights, sanctions all sorts of exclusive privileges (powers to exclude). An owner of property thus has that legally-protected power which, by definition, is the essence of monopoly: the power to exclude others and thus economically to coerce them to pay what he demands for its use.

Many early defenders of laissez-faire blinded themselves to this important monopolistic factor in the free-enterprise system. Bentham, usually described as such a defender, was not thus blinded. One hundred sixty-three years ago, in a book written in 1782, but first published in 1945, he repeatedly dwelt on this factor. See Bentham, The Limits of Jurisprudence Defined, edited and with an introduction by Everett (1945), 35, 37, 38, 49, 50, 55, 61–63, 67–68, 73, 106–111. Cf. Goldman, Book Review (1945), 6 Fed.Bar.J. 971.

Without knowledge of Bentham's unpublished book, several other writers made the same point. Outstanding is Commons, Legal Foundations of Capitalism (1924), 6, 13, 14, 34, 36, 52, 53–54, 59, 120–121, 128, 215, 297, 304, 320, 365; Commons, Legislative and Administrative Reasoning in Economics, 26 J. of Farm Economics, (1942), 369, 379; cf. Parsons, John R. Commons' Point of View, 17 J. of Public Utility Economics (1942) 246. Commons, among other things (loc. cit. 52, 120-121, especially 215ff) stressed the fact that "property" involves some portion of "sovereignty," the sovereign power of the state. See also Commons, Bargaining Power, 2 Encyc. of Soc. Sciences (1930) 459. Commons acknowledged his debt to Veblen's

Theory of Business Enterprise (1904); see especially chapter VIII of Veblen's book.

Similar ideas were expressed by others. See Hale, Coercion and Distribution in A Supposedly Non-Coercive State, 38 Pol. Sc.Q. (1923) 475; Hale, Force and The State, 35 Col.L.Rev. (1935) 149; Hale, Our Equivocal Constitutional Guaranties, 39 Col.L.Rev. (1939) 563; Cohen, Property and Sovereignty, 13 Cornell L.Q. (1927) 8, reprinted in Cohen, Law and the Social Order (1933) 41, and Cohen, The Basis of Contract, ibid., 69. Lippman, The Good Society (1937) 186–191, 222, 269–276. See also Brandeis, J., dissenting in Truax v. Corrigan, 1921, 257 U.S. 312, 322, 368, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; cf. my dissenting opinion in Witmark & Sons v. Fred Fisher Music Co., 2 Cir., 125 F.2d 949, 954.

That Bentham was by no means a perfect "Benthamite," see Everett, loc. cit., 49–52, 62; Lynd, England in The Eighteen-Eighties (1944) 14, 98; Dicey, Law and Opinion in England, (2d ed., 1914) passim.

[8] Adam Smith said that the principal vice of the "mercantile system," which he opposed, was that, under it, "the interest of the consumer is almost constantly sacrificed to that of the producer, and it seems to consider production * * * as the ultimate end of all industry and commerce." He asserted that "consumption is the sole end and purpose of production; and the interest of the producer ought to be attended to, only so far as may be necessary for promoting that of the consumer." Smith, Wealth of Nations (Modern Library ed. 1937) Bk. III, Ch. VIII, p. 625.

As to the way in which this basic Smithian thesis was subsequently ignored and his teachings distorted, see, e.g., Lynd, loc. cit. 100. As to Smith as a "nationalist" who opposed unrestricted "free trade," see Williams, Post War Monetary Plans (1944) 148–149.

[9] Holmes, Privilege, Malice and Intent, 8 Harv.L.Rev. 1 (1894) reprinted in Holmes, Collected Legal Papers (1920) 117, 120–121; Vegelahn v. Guntner, 167 Mass. 92, 104, 44 N.E. 1077, 1079, 1081, 35 L.R.A.,N.S., 722, 57 Am.St.Rep. 443; see Restatement of Torts, § 708.

petition but solely to damage his rival.[10]) In other words, usually where the economic interest of consumers conflicted with the economic interest of the competitor, only the consumer interest was judicially considered.

Yet, in intervening in the "unfair competition" cases, the courts at first seemed to have directed their attention primarily to the adverse effects of unethical business activities on business competitors and to have paid relatively little heed to the interest of consumers. For it does not follow that because conduct is unfair to a business rival it will harm consumers: By practices which are unethical when viewed from the angle of his competitors, a businessman is frequently able to undersell them; the resultant lowered prices ease the strain on his customers' pocketbooks fully as much as if he had acted "fairly."

"Poaching" on a business rival's trade-name was an outstanding type of unfair competition with which the courts interfered. Inescapably, in protecting the first business users of such names, the judges created exclusive privileges—monopolies. But in the early cases of that kind the judges scarcely perceived that they were not adhering to the rule that consumer welfare is paramount. This fact was concealed by calling a trade-name a "property right"; for, as previously observed, an exclusive "property right" was an exception to the laissez-faire theory of completely unrestrained free enterprise. Of course, in saying that a trade-name was a "property right," the courts begged the question: The question was whether, as a matter of policy, the courts should regard the first user of a name as the "owner" of a new kind of exclusive property right—and so possessed of a monopoly.[11]

But, seemingly, before long the neglect of the consumer in the trade-name cases aroused the judicial conscience. This aroused conscience seemed to have prompted statements in the opinions that the courts' major purpose in granting injunctions against the unfair use of trade-names was to protect customers (consumers) from deception; that deception, it was said, inflicted economic injury on the customers. Such statements (perhaps because they were something of an afterthought) the judges did not verify. No one bothered to ascertain whether, in fact, when articles made by Jones are so labeled that the buyers think they were manufactured by Smith, the buyers invariably or usually suffer monetary loss as a result of the deception. Had suits been brought by the deceived buyers, the courts would have required proof of such actual economic detriment to the buyers; for it has never been held that an action will lie for deceit entailing no financial disadvantage; but the trade-name suits were not brought by buyers; they were brought by merchants asking protection from unfair competition. Nevertheless, for years the courts, when granting such protection, justified their decisions on the ostensible but unverified ground that the customers were being guarded against financial harm.

To be sure, the courts also referred to the injury to the first user of the name. But they did not stop to ask whether there was any conflict between the objective of (a) aiding consumers and (b) that of preventing loss to the businessman who first used the trade-name. They failed to see that the doctrine of so-called "unfair competition" is really a doctrine of "unfair intrusion on a monopoly." Had they done so, they would squarely have faced the question of the value to consumers of such a judge-made monopoly.

But reiteration of the consumer-benefit argument was bound, sooner or later, to evoke doubts such as this: If Alert & Co. sells a laundry soap, under the name "Quick

---

[10] Tuttle v. Buck, 107 Minn. 145, 119 N.W. 946, 22 L.R.A.,N.S., 599, 131 Am. St.Rep. 446, 16 Ann.Cas. 807; Restatement of Torts, § 709; Cf. Ingo v. Koch, 2 Cir., 127 F.2d 667, 672, note 7 and cases there cited.

[11] As Mr. Justice Holmes said, "for legal purposes, a right is only * * * the imagination of a substance supporting the fact that the public force will be brought to bear upon those who do things said to contravene it * * *" The basic issue, when a right is asserted, as he often said, is one of policy: Since "the real justification for a rule of law, if there be one, is that it helps to bring about a social end which we desire, it is * * * necessary that those who make and develop the law should have those ends articulately in their minds * * *", and should not mechanically apply logic to "postulates taken for granted without inquiring into their worth * * *" Holmes, Collected Legal Papers (1920) 238, 239, 313 Cf. Commons, loc. cit., 72, 73, 325, 326, 348, 349, 356.

Clean," at 75¢ a cake, and a competitor, Wiseacre, Inc., then begins to sell the identical soap under the same name at 50¢ a cake, Alert & Co. loses customers, and therefore money, if it maintains its price; but the purchasers are misled to their financial benefit. If the sole purpose were to protect consumers from direct financial loss, the second name-user in such a case would have a complete defense if he showed that he sold, at a lower price, precisely the same article (compounded of exactly the same ingredients) as the first user.

There are other reasons assigned for judicially safeguarding trade-names. The public interest involved "is primarily in the preservation of honesty and fair dealing in business and in procuring 'the security of the fruits of individual enterprise.' However, there is also the factor that the possibility of obtaining such monopolies as a reward for their enterprise may have the effect of inducing businessmen to bring out new products which may indirectly benefit the consuming public." [12]

But the conventional assumption that trade-name protection importantly adds, in direct fashion, to consumers' economic welfare, has not as yet been proved to be true in fact. And the doubts about its truth have brought this question sharply into focus: Even if these trade-name exceptions to the presumption in favor of competition are of no direct use to consumers, do they serve a sufficiently important social interest to justify their existence?

The judicial answer has been, "Yes, in general": A trade-name will still be protected against "unfair" practices, even if those practices mislead consumers to their pecuniary advantage.[13] But emphasis on the exceptional nature of the monopoly-creating judge-made trade-name doctrine stimulated increasing judicial caution in its application. The courts (expressly or tacitly) insisted that, more adequately than theretofore, consideration must be given to the overall policy of not unduly hampering competition.

So the courts hold that one who was initially entitled to legal protection of a trade-name loses that right if the name (because of too effective advertising or otherwise) comes to be generally understood as a generic or descriptive designation of the type of goods with which the name is used. Restatement of Torts, § 735. In such a case, the first user is in nowise at fault; but his monopoly, if sustained judicially, would become so widespread as to be excessively harmful to the buying public; the courts therefore refuse to lend it their aid.

Perhaps the course of the trade-name decisions has another explanation: The earlier, more generous, rulings seem to have occurred in that period when—deviating from their original attitude—the courts were silently minimizing the public interest in patents and were benignly disposed towards broad interpretations of grants of patent monopolies. Although the trade-name monopolies, unlike patents, were made by the judges without benefit of express legislative authority,[14] the courts' attitude towards patents, by a sort of intellectual osmosis, affected their rulings concerning trade symbols. When, more recently, the older, stricter, judicial views about patents re-emerged,[15] this strictness, in part at

---

[12] Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 958.

If the bringing out of new and useful products is to be considered an important element, then perhaps the plaintiff should in each case be required to show that his product is new and useful.

[13] Non-economic snobbish desires of consumers (of the kind analyzed by Veblen) and the satisfaction of their desires engendered by ignorance have been said to be entitled to judicial protection, at least in the Federal Trade Commission cases. See Benton Announcements, Inc. v. Federal Trade Commission, 2 Cir., 130 F.2d 254; Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 78, 54 S.Ct. 315, 78 L.Ed. 655.

It is perhaps not inappropriate to ask whether snobbism and catering to ignorance are important social interests deserving governmental assistance.

[14] Again I except the rights in trade-names resulting from orders issued by the Federal Trade Commission under the Federal Trade Commission Act.

It is seldom observed that that Commission, generally supposed to be hostile to monopolies, is authorized under that Act to validate trade-name monopolies, and that it frequently does so; that it sometimes does so to protect snobbism, see note 13, supra.

[15] See, e.g., Cuno Engineering Corp. v. Automatic Service Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58; Muncie Gear Co. v. Outboard Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171; Cover v. Schwartz, 2 Cir., 133 F.2d 541; Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130

least, seems to have carried over into the trade-name decisions.[16]

The public today is displaying a revived, lively interest in "free enterprise." That revived interest, one may hope, will not prevent a discriminating consideration of socially desirable monopolies or partial monopolies, an adequate cognizance of what, with increasing understanding, many modern economists call "imperfect competition" or "monopolistic competition." Those who, oversimplifying economic problems, thoughtlessly urge the elimination of virtually all monopolies, not only disregard the unavoidable existence of monopolistic elements in almost all kinds of competition but dangerously invite a program which, by neglecting socially valuable aspects of some industrial integrations ("oligopolies") in some mass production industries, might tragically reduce our living standards.[17] Monopoly-phobia, like most phobias, is both a symptom and a cause of a neurotic tendency which, in refusing bravely to face facts, cannot yield intelligent guidance.[18]

But, without succumbing to that phobia, the courts, having contrived the doctrine which created trade-name monopolies, have wisely re-examined the assumptions lying at the foundation of that doctrine.

3. That re-examination, as I shall later indicate, has already affected the rulings applicable to cases like that before us here, and, I think, should affect them further.

In such cases, a plaintiff, who, by use, has pre-empted a name as the symbol of a certain product, asserts that no one else, including the defendant, may, without the plaintiff's consent, use that name as a symbol of another, different, product which the plaintiff has never sold. Obviously, purchasers of the second product are not fooled into believing that it is the same as the first product. The deception, if it exists, consists merely of the erroneous belief that both products come from a common source. No harm to purchasers (consumers) results from such an erroneous belief. The harm, if any, is to the plaintiff, and is said to be this: The defendant's

---

F.2d 290, 292; Picard v. United Aircraft Corp., 2 Cir., 128 F.2d 632; Sinclair & Carroll Co. v. Interchemical Corp., 65 S. Ct. 1143.

That this trend was well under way at least as early as 1927, see Picard v. United Aircraft Corp., supra, 128 F.2d page 639, note 2.

[16] The "clean hands" doctrine was vigorously applied in the trade-name cases earlier than in the patent cases. As to "clean hands" and trade-names, see, e.g., Renaud Sales Co. v. Davis, 1 Cir., 104 F. 2d 683, 685; Gynex Corp. v. Dilex Inst. of F. Hygiene, 2 Cir., 85 F.2d 103, 106; Youngs Rubber Corp. v. C. I. Lee & Co., 2 Cir., 45 F.2d 103, 110; L. P. Larson Co. v. Wm. Wrigley, Jr., Co., 7 Cir., 253 F. 914, 916. As to "clean hands" and patents, see, e.g., Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Sola Electric Co. v. Jefferson Elec. Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165.

Perhaps this doctrine received vigorous application to trade-names earlier because plaintiff's public use of the name is the foundation of his monopoly; the equivalent is not true of the patentee's monopoly. Special Equipment Co. v. Coe, 65 S.Ct. 741.

[17] There is need to study once more, but to revise in the light of more experience, the views of Theodore Roosevelt. See, e.g., his Autobiography (1913) 574–579.

Cf. Lewis, A History of American Political Thought (1937) 354–355. See also Volin, Henry Carter Adams: Critic of Laissez Faire, 3 Journal of Soc. Philosophy, 285 (1938); McConnell, The Basic Teachings of The Great Economists (1943) 159, 162, 165, 166–170.

[18] As we said in Eastern Wine Corp. v. Winslow-Warren, Ltd., supra: "There are some persons, infected with monopoly-phobia, who shudder in the presence of any monopoly. But the common law has never suffered from such a neurosis. There has seldom been a society in which there have not been some monopolies, i.e., special privileges; the legal and medical professions have their respective guild monopolies; the owner of real estate, strategically located, has a monopoly; so has the owner of a valuable mine; and so have electric power companies. No one seriously questions whether there should be some monopolies; the only question is as to what monopolies there should be, and whether and how much they should be regulated legislatively or curbed judicially."

"Public Utility" is a label for a business as to which it has been decided that competition is socially undesirable and should be prevented in whole or part. That category has grown over the course of years, and there is no reason to conclude that it has been forever frozen. Of course, all such businesses do not need to be similarly regulated.

product may be so "inferior" as to create ill-will among consumers directed against the supposed common maker of both products, with the consequence that the good will of the plaintiff, as maker of the first product, will be impaired.

Accepting that principle as the basis of plaintiff's suit, logically plaintiff should fail, absent proof that defendant's product is actually "inferior," i.e., so shoddy or substandard that such impairment of plaintiff's good will is a likely result. As plaintiff in the case at bar has offered no such proof, I am doubtful whether, on rational grounds, it is entitled to governmental protection of the widespread monopoly it claims. However, as the courts have not heretofore required such proof in such cases, I think we should not do so here, but should leave that issue to the Supreme Court.

4. In this type of case, the older view was that the defendant should be enjoined even if the second product was somewhat remote in kind from the first.[19] Recently, however, re-examination of the principles at the bottom of the trade-name doctrine has induced a reaction: The courts have indicated a limitation of the ruling in the Aunt Jemima case to instances where the two products are so clearly in the same general field of business that, with a fairly high degree of probability, purchasers will assume that the two products come from the same source.[20]

As no buyers were called as witnesses, there is no direct evidence in this record of the fact that consumers believe, or are likely to believe, that defendant's vitamin tablets are made by the maker of "V-8" vegetable-juice. That fact, if it be one, must therefore rest on inference. In deciding whether to draw such an inference, we must, then, rely on our own surmises. I know that I, for one, would never think that defendant's tablets, sold in drug-stores, are the product of the manufacturer of "V-8" vegetable-juice, sold in food-stores and restaurants. I am reluctant to conclude that any considerable number of my fellow-citizens are more easily fooled than I am.

5. My doubts are the greater because plaintiff itself employs a different symbol, "Stam," in vending its own vitamin tablets. Since plaintiff did not originate the symbol—which, as heretofore noted, had previously been utilized by others in selling automobile-engines, a shaving-cream and an after-shave lotion—the scope of its monopoly should be peculiarly restricted. And it is fairly obvious that the plaintiff wants to play dog-in-the-manger; for it has manifested no intention of ever selling vitamin tablets labeled "V-8." The Supreme Court, because of implications it found in the patent statute and its legislative history, has held that, generally, nonuser of a patent does not deprive the patentee of his right to exclude others from using it.[21] But, as the trade-name doctrine is not grounded in any statute,[22] and derives from actual use of a name, the plaintiff's right to a monopoly when it thus plays dog-in-the-manger is far more questionable.

Plaintiff's real purpose seems to be not to safeguard its good will as maker of a vegetable-juice but to shield itself from competition with its "Stam" vitamin tablets. Consumers will not be advantaged by such interference with "free enterprise." One wonders whether, in such circumstances, plaintiff comes into equity with the required spotless hands.[23]

6. The conclusion of my colleagues outweighs my doubts sufficiently so that, although with much hesitation, I concur. I would not, however, be sorry if the Supreme Court reversed our decision.

---

[19] Cf. Aunt Jemima Mills Co. v. Rigney & Co., 2 Cir., 247 F. 407, L.R.A.1918C, 1039.

[20] See, e.g., Durable Toy & Novelty Co. v. J. Chein & Co., 2 Cir., 133 F.2d 853; cf. Eastern Wines Corp. v. Winslow-Warren, Ltd., supra, certiorari denied 320 U. S. 758, 64 S.Ct. 65, 88 L.Ed. 452.

[21] Special Equipment Co. v. Coe, 65 S. Ct. 741,

[22] Except perhaps in the Federal Trade Commission cases.

[23] See note 16, supra.