## ELECTRO-DYNAMIC CO v. WESTINGHOUSE ELECTRIC & MFG. CO.

(Circuit Court, S. D. New York. November 1, 1911.)

PATENTS (§ 328*)—ANTICIPATION—ELECTRIC MOTOR.

> The Pfatischer patent, No. 775,310, for a variable speed motor of the direct current shunt wound type, having interpoles and a field rheostat to effect commutation without sparking, with a variable load as well as at variable speed, in view of its lack of specific description, could only be valid as a pioneer combination patent, and, as so broadly construed, is void for anticipation in the prior art.

In Equity. Suit by the Electric-Dynamic Company against the Westinghouse Electric & Manufacturing Company for infringement of letters patent No. 775,310 for a variable speed motor granted November 22, 1904, to Mathias Pfatischer. On final hearing. Decree for defendant.

Mr. Davis and Mr. Pennie, for complainant.
Mr. Neave and Mr. Fish, for defendant.

HOUGH, District Judge. The patentee (complainant's assignor) first declares his invention to be an improvement in "variable speed motors," but, before his description proceeds far he limits himself to one type of machine, viz., direct-current shunt-wound motors, and the results sought are (in his own words) to produce a motor of the type last mentioned which will "effect commutation without sparking, with a variable load as well as at variable speed, and capable of rotation in either direction" while operating upon a single voltage. It is admitted that complainant's machine does (within quite wide limits) possess these desirable characteristics, and also that defendant's motor is an infringement if the patent is enforceable, so that the gist of this action is an inquiry whether Pfatischer's alleged invention is valid in view of the state of the art at the asserted date of invention (1903), or, more specifically stated, the questions are (1) whether the specification really tells a reasonably skillful person how and by what means to reach the patentee's asserted result; (2) whether that result is anything more than the adaptation of old and well-known electrical appliances to new commercial requirements; and (3) whether not only the principles of Pfatischer, but the embodiment of them in a machine, is not anticipated by at least one device practically and publicly used years before the date of patentee's asserted discovery.

An answer especially to the first query requires a somewhat careful study of the language of the patent. This document deals extensively with "certain conditions which are encountered in the operation of a motor of the class contemplated"; i. e., a direct-current shunt-wound motor. It needs no other evidence than the description of difficulties to show that the machine itself was familiar when application for patent made. It is therefore stated as the sum of the conditions observed and difficulties encountered that, as the rotation of the commutator causes the contact of the brushes to diminish on one segment while increasing on the next, resistance increases in one while dimin-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ishing in the other. This varies the current in the coil short circuited between the segments, and generates an electro-motive force tending to maintain the varying current, and it is this force which "causes sparking under the brushes." The patentee then recognizes as known to the art various methods of minimizing the "maintaining e. m. f." and therefore the destructive sparking. They are, causing commutation to take place in a weak magnetic field, so arranged as to produce in the short-circuited coil an e. m. f. opposite to and intended to equal the maintaining e. m. f. aforesaid; and this compensating field is reached by shifting the brushes. But the compensatory field is, in turn, weakened by the opposition of the e. m. f. generated by the revolution of the armature-coils across the magnetic field of the poles; while further the problem is rendered more complex through the armature current varying with the load, so that with load increased the commutation field is not sufficient to prevent sparking. It is recognized, also, as known that, if with a direct-current shunt-wound motor speed is to be increased, the strength of the main field poles must be decreased, whereby the commutation field is weakened, and sparking augmented; and finally, if the motor be fitted to run in either direction, by placing the brushes midway between the poles, the difficulty is aggravated by removal of the brushes from the commutation field.

After prolonged study of evidence largely dealing with elementary electrical engineering, and necessary to enlighten the quite properly assumed ignorance of the court. I am of opinion that this statement of conditions is correct; but, whether it is exactly right or not, it is enough to show that Pfatischer was dealing with a machine old in the art, and one which according to all the evidence was known to be capable of working with different loads at different speeds, and in either direction, but, if it was to do these things, the brushes had to be shifted, and the range of operation from normal to destructive sparking did not exceed 50 per cent. The type of machine made and sold by both parties to this suit, and covered by the patent (if it is valid), will operate over a range of 400 per cent. certainly, and perhaps 600, wherefore it is next proper to ask, What cause does the patentee assign for the improvement, and what does he tell the world about practically applying his discovery of that cause?

He declares that the cause of improved operation, and, indeed, the improvement itself, consists of:

"The provision of auxiliary field pole-pieces which are very small as compared with the main pole-pieces, which are located between the latter, and provided with coils connected in series with the armature, so that all of the current taken by the latter flows through the coils of said auxiliary field, which are so proportioned and arranged as to give the proper field for commutation."

This is the entire invention, viz., the insertion of interpoles wound in series with the armature into a shunt-motor of familiar type.

But how does the patentee tell the world to apply and utilize his thought? Here recourse must be had to the evidence, from which it plainly appears that not every interpole will serve, and that utility depends wholly on the relation of its windings to the proportions of

the rest of the machine, to the voltage furnished, and the kind and variety of work to be performed; yet, except for the general and very obvious advice, that the interpole is to be relatively small, and that the coils are to be so arranged as to give "the proper field," nothing is found in the patent which would enable a skilled mechanic to build an operative motor from the patentee's description alone.

The inference drawn from this is that the patent must be void, unless the suggestion of using interpoles, however proportioned, constitutes invention, and this was (it seems to me) the thought of the draftsman of the application, and is the basis of complainant's argument. This result may be tested by the claims, which are numerous, but present only one conception of the invention. Each claim is for a combination, and the seventh may be taken as a very full exposition of the patentee's demand. This seventh claim is for the combination in "a direct-current shunt-wound motor" of an armature and a commutator with the following carefully enumerated elements: (1) A field frame (which was well known); (2) a circular series of field poles, comprising two alternate series of separable pole-pieces of, respectively, different cross-sectional area (viz., poles and interpoles); (3) means detachably securing pole-pieces in frame (which is an unimportant detail of construction); (4) coils for said poles (which were and are matters of course); (5) connections including the coils of alternate poles in shunt relation to the armature (viz., the main poles are in shunt as had long been the practice); (6) connections including the coils of the other alternate set of poles in series relation with said armature (viz., the interpoles are in series); (7) common current supply (which was also a matter of course); (8) Brushes in contact with commutator midway between "adjoining poles" (a situation known to be desirable for rotation in either direction); and (9) means to adjustably vary the strength of the field in the shunt coils, independently of the series coils (viz., a field rheostat, an old and well-known device).

After specifying these elements of the combination, this (and every other) claim concludes:

"Whereby the armature is enabled to rotate at variable speed and variable load in either direction without sparking and without variation in the position of the brushes, substantially as set forth."

That this "Whereby clause" adds nothing to the claim is fundamental. It is a statement of asserted result, not of method or means of reaching it; and in this instance it is but a repetition of the stated "object of my invention" with which the application begins, a sort of q. e. d. triumphantly affixed to the asserted solution of the problem.

It is concluded that this analysis of a typical claim strengthens the conclusion that the patent is upon the simplest form of shunt-motor, with interpoles in series and field rheostat added; and I am further of opinion that a person reasonably skilled in the art could not from the patent description alone have made an operative machine, because he would have had to work out for himself the proportions, which are just as important as the combination so far as successful operation is concerned. This finding is, however, not conclusive against the

patent, if the combination was so wholly new as to entitle the patentee to claim any combination of any field poles and any rheostat with a shunt-wound direct-current motor. It is therefore necessary to further examine the evidence to ascertain, not only what specific uses electrical history shows, but to discover the principles on which Pfatischer and others working in the same field necessarily depended to accomplish results.

It is first found that the problems presented by varying speed and varying load of a shunt motor are electrically the same, and it follows from this that the patent uses unnecessary words in dwelling upon these two characteristics of the motor claimed. If the machine can vary speed without sparking, it can similarly vary load. It is also found that an electric motor and an electric generator may be (and for the purposes of this case are) the same machine, the only distinction is in the prime mover, and, electrically considered, the distinction does not entail a difference. It is equally true that by reversal of current the direction of motor revolution may be changed, and that this has long been known and practiced.

Why, then, are interpoles or other devices desirable? Because, if the ordinary motor with which Pfatischer starts is called upon to perform at other than a nearly constant rate, the armature reaction increases so suddenly as to cause destructive sparking, and it does this because the commutation owing to distortion of the main field is imperfect. Therefore Pfatischer's electrical problem is wholly one of commutation, as claimed by defendant's expert witness, and as (in my opinion) shown on the face of the patent itself. All that the patentee does or wishes to do is to increase the radius of action of the old shunt-motor by extending its possibilities of reasonably sparkless commutation. If he does this by means of solving electrical problems which had been solved before in the same way, though without using the solution for the purpose of producing a convenient motor for machine tool purposes (which is the great use of the motor in suit), then he did nothing patentable, for the public was entitled to all the possible uses of any device already delivered to the public when Pfatischer formulated his invention. Viewed from this standpoint, complainant's field is greatly narrowed by Mather's patent (No. 321,990, July 14, 1885), for that invention shows and describes interpoles in a generator performing and shown to perform exactly the same functions as those in Pfatischer's machine, and Mather also knew and pointed out that his invention was equally applicable to motors.

How, then, did this patent come to be issued? Because it was apparently held that while interpole motors were known, if not common, that the use of such motors, with a field rheostat for varying speed, was new. I am, however, quite unable to perceive that when interpole machines were old, and field rheostats for varying speed by varying field strength were even older, there was any patentable invention in combining these old ideas. There might have been a narrow patentable idea in a particularly proportioned machine neatly embodying the old principles, but this patent cannot be sustained on that ground as above pointed out.

Complainant seeks to overcome this position by dwelling upon the "adjustable" speed of the motor, but the patent may be searched in vain for that word. Yet, after all, the speed cannot be adjusted without being varied, and such variation is attained by variation of field strength through use of the rheostat. It is a physical fact that the nature of a direct-current shunt-wound motor is to regulate itself to a constant speed, and this speed depends principally upon the voltage supplied. Rheostatic control has long been available for varying or adjusting speed within narrow limits, and, when those limits are largely increased by the addition of long-known interpoles, invention does not reside in the united application of both principles. From the evidence it seems plain to me that a field rheostat is almost as much a part of a shunt motor as a necessary bolt or screw, so that the more accurate method of viewing complainant's machine is to regard it as an old-fashioned motor with interpoles only added, and from this viewpoint it is fully anticipated by the Sautter Harle French patent of 1892, if not by the Mather invention, supra.

The final question is whether the machine in suit is not identical in principle of operation with a motor manufactured in 1899, and known (in this case) as the Ridgway motor. That machine is a direct-current shunt-wound motor, having interpoles and field rheostat, and is admittedly identical in principle and mode of operation with complainant's device, unless differentiated by the following fact: The interpole winding (in series with the armature), instead of being confined to the interpole, is carried to each of the adjoining main poles and attached to the same, although it does not encircle the main pole itself. Whether this difference of construction involves a difference in principle has been vigorously asserted and denied. The effect of the coils upon the interpole is to energize that pole into a magnet, and produce what Mather calls a "neutralizing magnet." Complainant asserts that, if the winding be confined to the interpole, the lines of force are, so to speak, "squirted" into the armature at the point of commutation and nowhere else; whereas, if the winding be extended in the manner of the Ridgway motor, it becomes a compensating winding only, tending to destroy or counterbalance armature reaction, which is something that the Pfatischer device does not do, and is not intended to do.

It is impossible for me to reconcile the conflicting claims of the experts on this question, nor can I venture upon a technical discussion of the views of either side; but to me there is no answer to defendant's proposition that, even assuming that the extended winding of the Ridgway interpole is compensatory, yet the interpole is there, it is energized, it does act as an interpole, and does what an interpole is expected to do, and has long been expected to do, in assisting sparkless commutation. Therefore the Ridgway interpole is performing the same function as the Pfatischer interpole, and it makes no difference that the extended winding connected with the interpole may be doing something more.

It is therefore concluded:

(1) That the patent itself, owing to the paucity of its descriptions, can only be valid as a pioneer combination patent.

(2) That, considering the state of the art in 1903, the field was not open for so radical a combination device.

(3) That the device of the patent has been fully anticipated by the Ridgway machine.

Let the bill of complaint be dismissed.