### GYNEX CORPORATION et al. v. DILEX INSTITUTE OF FEMININE HYGIENE, Inc., et al.
### No. 393.

Circuit Court of Appeals, Second Circuit.

July 27, 1936.

---
**1** Rehearing pending at date of publication.

104

Sylvester & Harris, of New York City (Irving F. Goodfriend and Charles L. Sylvester, both of New York City, and Sidney Kaminsky, of New York City, of counsel), for appellants.

Howard P. King, of New York City, for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

The plaintiffs charge infringement of United States patent No. 1,870,942; of trade-marks Nos. 276,732, 283,535, and 293,004; and unfair competition. They were successful on all issues in the court below, and the defendants have appealed from the decree.

All the corporations involved in the litigation were organized under the laws of New York and have their principal places of business in New York City. Defendants Door and McCarthy are employees of defendant Dilex Institute of Feminine Hygiene, Inc.

Gynex Corporation owns patent No. 1,870,942 for a syringe which was issued August 9, 1932, upon the application of Dana C. Beatty, filed May 26, 1928. Trade-mark No. 276,732 was registered in its name, and is the word "Gynex" made up of letters having a peculiar conformation. Nos. 283,535 and 293,004 both show the figure of a woman standing upon a double block base which bears the inscription "Bureau of Feminine Hygiene" and whose upraised arms support a block bar with the word "Knowledge."

### The Beatty Patent.

The first sentence in the specifications states that: "This invention relates to syringes and more particularly to mechanically dilated vaginal syringes and the method of making the same." The principal object of Beatty was to construct a vaginal syringe which would be in normal position of relatively small diameter in cross-section throughout its length, and which was equipped with soft rubber fingers at the far end that could be dilated in such a way that extreme extension would occur at, or very near, the end, thereby permitting whatever was to be injected through the syringe the better to find its way to the parts it was desired to reach. To do this Beatty took a hollow metal sleeve of the wanted outer and inner diameter which he reduced at one end to form a neck and shoulder. He took a soft rubber tube with a rounded closed end which had an inner diameter of the right size to permit the open end to be drawn over the metal neck where it fitted tightly and abutted snugly against the shoulder to give a uniform outer diameter to the sleeve where it was all metal; where partly metal and partly rubber; and where it was all rubber tip. This tip was of the desired length, and had longitudinal slits between its base, the part drawn over the metal neck of the sleeve, and the rounded end which divided the intermediate rubber into several strips or "fingers" of equal size. At the other end of the metal sleeve he placed a loop handle. Inside the sleeve was a round metal tube of smaller diameter but greater length. One end of it was attached by a button head to the extreme rounded end of the rubber tip; the other end extended out beyond the loop handle of the sleeve and was given a suitable head to be inserted within the end of a rubber tube attached to a collapsible bulb. What has been called the loop handle consisted of two bow pieces made of rubber or other resilient material which were joined at their ends to rings so that the bows were opposite each other as are the ends of an oval. The two connecting rings were fitted, one in a collar groove at the end of the sleeve opposite the rubber tip and the other in a similar groove near the end of the inner member over

which the rubber bulb tube was placed, thus mounting the loop handle rotably on the named ends of the sleeve and inner member, so that, when the handle was compressed, the inner member was drawn back in the sleeve pulling with it the rounded end of the rubber tip to which it was attached by the button fastener thereby causing the rubber fingers to bulge outwardly. In accordance with the disclosure, the syringe was to be operated by insertion when in its normal size throughout its length, and then by compressing the loop handle the tip became a dilator, since it was held from slipping back over the sleeve by the shoulder against which its base rested. The rubber was so formed that extreme expansion occurred at or very near the rounded end making a nearly flat conformation at the end. This construction appears to make an efficient and highly satisfactory vaginal syringe.

But whether there was any invention disclosed is quite another matter, which depends upon what Beatty did, if anything, which had not before been disclosed in such a way that it had become free for anybody to use. We think he did nothing but construct, with such minor differences as would readily occur to any good mechanic, such a vaginal syringe as any one was free to make. In 1869, patent No. 58,695 for an improved syringe was issued to William J. Davidson. He disclosed a vaginal syringe having a nozzle at the tip behind which were elastic or expanding ribs that could be bowed out by turning a screw at the opposite end of the syringe. Expansion could be controlled within a desired limit by setting a screw in the slide member that ran in a slot in the sleeve. Some contention is made that Davidson even disclosed rubber fingers by his description of the ribs as "elastic or expanding," but all the rest of his disclosure indicates that they were in fact metal and but a slotted portion of the sleeve. However, with the sole exception of the use of rubber fingers, Davidson disclosed all that Beatty did so far as the claims now sued upon are concerned. And at the time Beatty applied for his patent the use of rubber fingers was old in the patent sense.

On March 31, 1926, William Friedman filed in the Patent Office his application for a patent for a mechanically dilated vaginal syringe which disclosed rubber fingers which were made to project outwardly after insertion by slidable movement of a metal tube within a sleeve. And, as early as 1885, a patent, No. 318,535 for a vaginal syringe, had been issued to Anthony Bihler showing a construction making use of a rotary movement to bow outwardly for purposes of dilation fingers made "preferably of silver-plated or other plated wire coiled spirally around a flat spring bowed slightly outward to insure the proper expansion of the spring when in use; but the springs may be made of other suitable construction and material."

Claim 4 of the patent in suit reads: "A syringe or the like comprising a sleeve having dilator adapted to be bent outwardly, said sleeve having its outer end providing an integral narrow flexible collar to the ends of the dilators whereby the said collar will turn outwardly with the dilator and the dilator will project substantially prependicularly when dilated from the axis and means for actuating said dilators."

■ All of this claim is clearly anticipated by Davidson except what follows after the word "whereby," and that portion described nothing except in terms of an asserted result. It is but a statement of how a syringe constructed with the parts mentioned will work, and adds nothing to the claim as a patent claim. Electro-Dynamic Co. v. Westinghouse E. & M. Mfg. Co. (C.C.) 191 F. 506, 508; Id. (C.C.A.) 202 F. 224. See, also, Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 257, 48 S.Ct. 474, 72 L. Ed. 868.

Claim 10 covers, in combination with a syringe or the like, "a dilator comprising a soft pliable sleeve" of the construction above described which will operate as stated. Claims 11, 12, and 13 cover the same sort of dilator having a pliable collar for gripping parts of the syringe. This feature refers to the gripping action of the rubber tip where its unslotted open end is pulled over the neck of the metal sleeve and up against the shoulder. It is the same way in which Friedman put his rubber member onto his metal sleeve, and the gripping is nothing more than he had, unless perhaps there is a difference in degree which would depend merely upon mechanic's choice in determining the area of contact and the tightness of the fit when the base of the rubber tip was put over the reduced end of the sleeve and up against the shoulder.

■ In view of the prior art already mentioned, nothing further is needed to support our conclusion that all the claims in suit, all of which, other than 4, are drawn to the flexible dilator, have been anticipated and are void. Union Paper Bag Machine

Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935; Knapp v. Morss, 150 U.S. 221, 14 S.Ct. 81, 37 L.Ed. 1059. Such improvements as Beatty may have made are only such changes in the known syringes as would have been made as a matter of course whenever desired. His was a new syringe in the sense that probably new selling points were present in it, but there was nothing new to be patented. See, Roberts v. Ryer, 91 U.S. 150, 23 L.Ed. 267; Milligan & H. Glue Co. v. Upton, 97 U.S. 33, 24 L.Ed. 985; Phillips et al. v. Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Rosenberg v. Carr Fastener Co. (C.C.A.) 51 F.(2d) 1014. And so all the claims in suit are held void for anticipation.

### Trade-Mark Infringement and Unfair Competition.

■ The three trade-marks are used in selling the syringe manufactured under the Beatty Patent under representations that the syringe made and sold by Gynex Corporation has been tested and approved by the Bureau of Feminine Hygiene, Inc. Only one inference can reasonably be drawn from the business methods used by the plaintiffs in selling the syringe, and that is that the test and approval advertized may be relied on by the public as being that of an independent, competent bureau qualified to test the syringe on its merits and which has approved it after doing so. The facts are that both plaintiff corporations have the same general manager, one Lindner; the same offices; the same officers; the same account books; and the same interest to make sales of this particular syringe. The approval by what is called Bureau of Feminine Hygiene, Inc., is no more in reality than the approval of the seller itself disguised under a rather high-sounding name calculated to indicate to the public that a research organization competent in the field of feminine hygiene has found the syringe meritorious. Not only was it shown that except for their separate incorporation the two corporations were to all intents and purposes the same, but it appeared as part of the selling scheme that the public was advised that inquiries sent to the bureau concerning feminine hygiene would be answered by Dr. Mary K. Baker. Lindner admitted that this Dr. Baker, whose picture was used in some of the plaintiffs' advertising, was not, and never had been, connected with the so-called bureau except in this way: She had given the bureau a power of attorney to open mail addressed to her at its office and there received. She permitted the bureau to answer in her name in letters written by office girls, not shown to have had any training in the subject whatever, inquiries which were received except those which the office girls elected to send to her. There is no very credible evidence that any were actually referred to Dr. Baker, but it was possible to do that and it may have occurred. Lindner testified she was a practicing physician registered in New York who maintained an office there, but he did not know where. Thus it appears that the business in which the plaintiffs used the trademarks in suit was permeated with fraud and imposition upon the public to whom sales were made or attempted by means of that fraud. Much of it was but the veriest deceit practiced solely to build up sales of the syringe. It was such inequitable conduct that neither plaintiff has come into court with clean hands and neither is entitled to any equitable relief. A court of equity will not lend its aid to protect property in a trade-mark fraudulently used. Memphis Keeley Institute v. Leslie E. Keeley Co. (C.C.A.) 155 F. 964, 16 L.R.A.(N.S.) 921; Worden & Co. v. California Fig Syrup Co., 187 U.S. 516, 519, 23 S.Ct. 161, 47 L.Ed. 282; Manhattan Medicine Co. v. Wood, 108 U.S. 218, 2 S.Ct. 436, 27 L.Ed. 706. This issue was not raised by the pleadings and, although called to the attention of the court below in argument, was put aside because as the court said: "I should regard it as unfair to inject into the case in any such way any such issue without advance notice to the other side." But this was not strictly a matter of defense. It was, instead, a matter calling for a refusal by a court of equity to be used in furtherance of a fraud upon the public. And so it need not be pleaded. Memphis Keeley Institute v. Leslie E. Keeley Co., supra, 155 F. 964, at page 974, 16 L.R.A.(N.S.) 921.

■ We are, consequently, precluded from considering this part of the action on what would be its merits were the plaintiffs in a position to complain in equity on the basis of the conduct of the defendants. As was pointed out in Youngs Rubber Corporation v. C. I. Lee & Co. (C.C.A.) 45 F.(2d) 103, equity is not concerned with the general morals of a plaintiff, but only with the conduct of a party in respect to the matters in issue, but here the fraud was one of the supports of the very business and trade-marks involved.

Decrees reversed and bill dismissed.