Matthew M. Levy, J.
This action is grounded upon a contract, dated May 2,1956, providing for the sale by the defendants of a certain business. Alleging that the plaintiffs are the purchasers and that the defendants breached the agreement by refusing to turn over the business in accordance with the terms of the contract, the plaintiffs sue for specific performance and an accounting of the profits, or, in the alternative, for pecuniary damages in the sum of $3,000,000. The cause (instituted, of course, on the equity side of the court) came to trial before me without a jury. Both sides waived findings of fact and conclusions of law. This opinion will constitute the decision of the court (Civ. Prac. Act, § 440).
The background of the basic contract stems from September, 1955, when preliminary negotiations were begun between Jennings (a plaintiff herein and the husband of the other plaintiff) and one Justin (a vice-president of the defendant Foremost Dairies, Inc., and president of Dolly Madison International Foods, Ltd., and of the defendant June Dairy Products Company, Inc., Delaware corporations and wholly owned subsidiaries of Foremost) for the purchase by the plaintiffs from Dolly Madison and June Dairy of Delaware of the assets of the latter. That company was engaged in processing and distributing dairy products in New York, parts of Connecticut and eastern New Jersey. Foremost is engaged in a country-wide business of the same kind.
On January 31, 1956, the plaintiffs organized the June Dairy Products Company, Inc., a New Jersey corporation, and, on that day, the newly formed corporation purchased the assets of June Dairy of Delaware, and certain assets of the June Dairy Division of Dolly Madison. The agreed over-all price was $3,256,000, payable by the purchasers in the following manner: $25,000 cash, paid by Jennings at the time of the signing of the contract; $800,000 in preferred stock of June Dairy of New Jersey; 80% of the accounts receivable in cash the day thereafter (the agreement providing for factoring thereof); the remainder of the receivables to be paid for as collected; inventory to be paid for as withdrawn from warehouse, with credit to be given for unusable inventory and obsolete machinery; and balance of the purchase price in cash at final closing date. Jennings and his company were given possession pending ultimate closing. Thereafter, differences between the plaintiffs and the defendants developed as regards alleged capital deficiencies, claimed misappropriations by Jennings, credits demanded by the purchasers for certain machinery and inventory claimed by Jennings to be obsolete and unusable, alleged drastic reduction of inventory by *330 Jennings without payment over of the proceeds to the sellers, and also in respect of J ennings ’ efforts to obtain from the defendants further financial support for his now floundering company.
In April 1956, Jennings, in behalf of his corporation, sought to have the defendants settle these differences. On April 13, 1956, at an arranged meeting, Jennings’ request was met with a proposal by Justin that Jennings resell to the defendants. A contract was drafted in the office of Foremost’s then attorneys, White & Case, Esqs., which was never signed. That draft, among other things, provided for the repurchase by Foremost of the Long Branch Division of June Dairy, a 12-year exclusive distribution franchise in Jennings, and a repurchase option to Jennings. The parties are in disagreement as to whether the negotiations were completed. The plaintiffs maintain that all the terms were agreed upon, with the signing of the documents remaining a mere formality. The defendants contend that final agreement was not reached and that all proposals by Jennings were rejected because of their lack of confidence in him, in that, as asserted by the defendants, Jennings had proved himself incompetent, untrustworthy and financially weak. According to the plaintiffs, they, acting in pursuance of the alleged contract, permitted Foremost to take over the assets of June Dairy with the understanding that performance of the contract would be completed by April 17,1956. The defendants, on the other hand, assert that while they did in fact take possession, that was not because an agreement had been reached, but rather because of imminent employee and customer defection and the rapidly deteriorating situation at June Dairy, and that both parties agreed to the immediate transfer while the negotiations were proceeding. In any event, the proposal or agreement was rejected by Foremost’s chief executive officer upon the stated ground that he would not enter into any contract with Jennings which required the extension of any credit to or doing any further business with him.
The White & Case draft did just that. It provided, in substance, that, in addition to June Dairy selling to Jennings or his nominee all of its inventory, supplies, trucks and business at Long Branch, together with its interest in a trade name, for $15,000 cash, it would lease to J ennings for 12 years all of the refrigeration equipment, office furniture and real estate owned by it and located at Long Branch at a specified monthly rental, and with Jennings being obligated, among other things, to make all normal repairs required for such property during the term of said lease. The draft agreement also provided that Jennings would have a 12-year exclusive distribution right for all products *331 sold from time to time by June Dairy in this specified area of New Jersey, with certain enumera ix-d restrictions.
Further negotiations continued. On April 26, 1956, the plaintiffs were repossessed of the Jersey City plant of June Dairy. On April 27, Foremost, through another subsidiary, joining with other creditors of the plaintiffs’ corporation, June Dairy of New Jersey, instituted involuntary bankruptcy proceedings, under chapter 10 of title 11 of the United States Code, against that company, and the petitioners applied for a receivership thereunder.
During this period negotiations were still carried on. The application for the receivership in the bankruptcy proceedings was adjourned to the afternoon of May 2 at the request of the plaintiffs’ counsel. On May 1, another of the plaintiffs’ counsel and counsel for the defendants arranged for a conference for the morning of May 2, to be held prior to the adjourned time of the bankruptcy proceedings, scheduled to be proceeded with at 2:00 p.m. on the same day. On that morning, a meeting was held at which the plaintiffs, Justin and counsel for the parties were present. One D’Ambrisi, for many years the manager oE the Long Branch operation of June Dairy, was also present at the law office suite but was not in the inner office during its progress, and did not participate therein.
At this session of May 2, 1956, a contract was drawn and executed by the plaintiffs and by Justin on behalf of the defendants. It is this agreement upon which the present suit is based. It provides: (1) that the plaintiffs sold all of their stock in June Dairy of New Jersey to Southeastern Dairy and Supply Company, Inc., an affiliate of the defendants, and received in payment therefor the sum of $25,000; (2) that, immediately upon the termination of the involuntary bankruptcy proceedings against June Dairy, Southeastern agreed that it would obtain from June Dairy a general release of the plaintiffs from any and all claims against them; and (3) that as “ further consideration for such purchase and sale, June Dairy Products Company, Inc., will also at such time enter into an agreement with Mr. D’Ambrisi, or a corporation of which he is an officer and director, relating to the Long Branch operation of June Dairy Products Company, Inc., according to the terms previously agreed upon between Mr. Jennings and Mr. Justin, as set forth in the draft of an agreement prepared by White & Case, as though such agreement were executed this day.”
Immediately after the signing of the agreement on May 2, the parties proceeded from New York City to the Federal court in Newark and successfully argued against the appointment of *332 a receiver at that time, on the ground that the stock of June Dairy had been sold, subject to the dismissal of the bankruptcy proceeding, and that, the creditors had been satisfied. The proceeding was thereupon adjourned. Early in April 1956, Jennings had organized another New Jersey corporation, Jersey Farm Products Corp., to effectuate a transfer to it of the Long Branch business. • D’Ambrisi was made an officer and director of the new company. In the evening of May 2, 1956, after the signing of the May 2 agreement, and after the court appearance, the plaintiffs procured an assignment to them from D’Ambrisi of all his rights under the contract. On May 15,1956, D ’Ambrisi told Justin that he, D’Ambrisi, could not proceed with the purchase. D’Ambrisi resigned as an officer and director of Jersey Farm. On June 29, 1956, the bankruptcy proceedings against June Dairy were terminated by consent of all the parties.
The plaintiffs demanded performance by the defendants of the May 2 contract. The defendants refused on the ground that, under the agreement, any sale must be to D’Ambrisi or a corporation of which he is an officer and director. The plaintiffs allege that D’Ambrisi had duly assigned his rights under the contract to them, and that the defendants’ refusal was a breach of the contract, causing damages so complex to compute that they cannot be readily ascertained, and justifying equitable relief by way of specific performance and an accounting of the profits, and, in the alternative, substantial damages. That, as I have said, is this suit. There is no action before me based upon any alleged misconduct of the defendants in the operation of the business of June Dairy of New Jersey from the time they took possession after the preparation of the White & Case draft.
The defendants set forth five separate defenses. The first two, dealing with the Statute of Frauds, have been stricken by prior order of this court, and will therefore not now be discussed. The defendants also interposed a counterclaim, in which they asked for a transfer to them of all of the stock held by the plaintiffs in Jersey Farm Products Corp., and an accounting for the moneys and properties allegedly misappropriated by Jennings as aforesaid. The counterclaim was dismissed on the ground that the release of Jennings provided for in the May 2 agreement was valid and effective. This ruling was affirmed on appeal (10 A D 2d 618). As a third defense, the defendants allege that the contract was personal to D’Ambrisi and was not assignable. In the fourth defense, it is alleged that the plaintiffs made false representations that were relied upon by the defendants with no knowledge of their falsity, and, as a result. *333 that the plaintiffs are not entitled to any equitable relief. As a fifth defense, the defendants pleaded that the assignment to the plaintiffs, signed by D ’Ambrisi, was procured by their fraud.
The defendants seem not to have pressed the fifth defense upon the trial. In any event, I find that it has not been proved on the facts and that it is insufficient as a matter of law. It will be recalled that D ’Ambrisi — inactive during the morning negotiation and execution of the May 2 agreement — assigned his rights thereto to the plaintiffs that evening. D ’Ambrisi did not testify at the trial. While, in his examination before trial, D’Ambrisi seemed to be quite hazy as to the signing of the assignment or as to the contents thereof or, indeed, as to the purchase of the Long Branch Division of June Dairy, I find from the evidence submitted that D ’Ambrisi signed the assignment with full knowledge of what he was doing, and without any misrepresentation on the part of the plaintiffs.
In any case, execution of the assignment has been adequately proved and not denied. I am of the opinion that, as a matter of law, the pleaded defense is not available to the defendants. To enable this defense to be invoked it was necessary for the defendants to interplead D’Ambrisi, the sole party to whom the defense would be available in the case at bar. For the rule as to this point seems to be “ that the fact that the assignor might have a valid cause of action against the assignee because of fraud practiced upon him does not affect the legal title of the assignee, and that no one other than the assignor can question the validity of the assignment because of such fraud.” (3 N. Y. Jur., Assignments, § 47; Matter of Holden [Hennenlotter], 271 N. Y. 212, 217.)
Late in — indeed, at the close of — the trial, the plaintiffs sought to project the theory that, in the May 2 contract sued upon, D ’Ambrisi was a mere nominee for them. This claim was not pleaded in the complaint and the plaintiffs moved to amend their pleading to conform to the proof by adding an allegation to the effect that D ’Ambrisi was such known nominee. The defendants opposed the motion. I granted it upon condition that the plaintiffs consent to (1) a reopening of the defendants’ case; (2) a reasonable adjournment, to permit the defendants to prepare to meet the new issue; and (3) submit themselves to further examination by the defendants before the resumption of and at the trial on that issue. WLereupon, the plaintiffs withdrew their motion.
I am of the opinion that the question of the efficacy of the assignment is the basic issue in the case. And both parties here recognized this, as measured by the extensive proof ably pre *334 sented by their counsel upon the trial, and by the briefs discussing the issue so fully and competently.
The principal operative factor here is that the defendants contracted with the plaintiffs to enter into an agreement with £ £ D ’Ambrisi, or a corporation of which he is an officer and director,” which agreement was to grant exclusive distribution rights to D ’Ambrisi or the corporation for a period of 12 years covering all products sold by June Dairy in the Long Branch area. Does that, without more, indicate that D’Ambrisi’s rights under the contract are not assignable by him? Or, put another way, can the plaintiffs frustrate the defendants’ right to enter into the future distributorship contract with D ’Ambrisi or the specified corporation only, by obtaining an assignment from D’Ambrisi to the plaintiffs?
“ [Executory contracts for personal services or those involving a relationship of personal confidence are not assignable by one party unless the other consents thereto ”. (3 N. Y. Jur., Assignments, § 7; emphasis supplied.) That exclusive distributorship rights fall into this exception of nonassignability is clearly brought out in Paige v. Faure (229 N. Y. 114). Faure, an automobile tire manufacturer, contracted with Paige and Lindner, giving them an exclusive agency to sell tires manufactured by and bearing the name of Faure. After several months, Lindner sold his share of the business to Paige and assigned to Paige individually all rights of Lindner and Paige. Faure refused to perform, maintaining that Lindner and Paige could not assign an exclusive distributorship to Paige individually. The Court of Appeals sustained Faure’s contention, in spite of the fact, as the court stated, that “ [t]here was no provision in the contract to the effect that Paige and Lindner were to devote their time and use their best endeavors to further the interest of Faure, or in fact to do anything except to purchase one thousand dollars’ worth of tires and pay him for goods sold by them” (p. 117). The court further said: “In view, however, of the credit and the exclusive agency given to them [Lindner and Paige], it is fairly to be implied that they were to devote their time and do whatever was reasonable and necessary to selling the defendant’s product. * * * [Faure] was to have the benefit of the services of both * * *. He agreed to give credit to both * * * and it may very well be, except for Lindner, he would not have executed the contract at all” (pp. 117-118). Thus, the rule evolved in Paige v. Faure is that rights arising out of a contract cannot be transferred if they are coupled with liabilities or if they involve a relationship of personal credit and confidence ” (p. 118).
*335 That an agreement includes the phrase “or his nominee ” does not make the contract assignable. In Ott v. Home Sav. & Loan Assn. (265 F. 2d 643) the phrase “ or your nominee ” was inserted in a letter-agreement involving the purchase of real estate. The court held the term to mean a ministerial representative, as customary in “ stock transactions or in the transfer of other interests represented by documents ’ ’, and went on to say that “ the words constitute an offer of a commitment to one individual, Harold L. Shaw, alone. If more had been intended, the words ‘ and his assigns ’ could have been inserted ” (p. 647). However, even had such substitute or additional terminology been used in the present case, this, in and of itself, would not make the agreement assignable. In Nassau Hotel Co. v. Barnett & Barse Corp. (162 App. Div. 381, affd. 212 N. Y. 568) plaintiff owned a hotel and contracted with defendants individually to operate it. They formed defendant corporation and transferred their rights to the corporation. The court held that the contract was not assignable to the corporation, even though the contract provided that “ this agreement shall inure to the benefit of and bind the respective parties hereto, their personal representatives, successors and assigns ” (p. 382). As stated by the court in Nassau (p. 384): “ The reason which underlies the basis of the rule is that a party has the right to the benefit contemplated from the character, credit and substance of him with whom he contracts (Humble v. Hunter, 12 Q. B. Ad. & El. [N. S.] 310) ”.
In Wetherell Bros. Co. v. United States Steel Co. (200 F. 2d 761) defendant had entered into a written contract with Wether ell Brothers Company, a Massachusetts corporation, appointing the latter exclusive sales agent for steel products on a commission basis. The agreement stated that the agent was to “ use its best endeavors to secure business ” (p. 762). The Massachusetts corporation was dissolved and on the same day its three stockholders sold to plaintiff, Wetherell Bros. Co., a Pennsylvania corporation, all of its assets, including its rights under the contract with defendant. Plaintiff sued defendant for breach of the contract. The court held that, since two corporations can have different charter rights and especially where each is incorporated in a different State, their powers would be different, and, in consequence, the court ruled that the contract was not assignable.
In the case at bar, the defendants contracted with the plaintiffs to enter into a specific agreement ‘ ‘ with Mr. D ’Ambrisi, or a corporation of which he is an officer and director ”. That would appear to envisage the expression of a confidence in D ’Ambrisi — whether he was to act in a personal capacity or *336 through a corporation in which he had some responsibility. That D ’Ambrisi might later not remain an officer or director — a factor which the plaintiffs emphasize — has no conclusive bearing. As expressed in New York Bank Note Co. v. Hamilton Bank Note Engraving & Print. Co. (180 N. Y. 280, 293), “ It is true that in dealing with corporations a party cannot rely on what maybe termed the human equation in the company; the personnel of the stockholders and officers of the company may entirely change. But though there is no personal or human equation in the management of a corporation there is a legal equation which maybe of the utmost importance to parties contracting with it.”
The plaintiffs urge that public policy generally favors the assignability of contracts as facilitating commerce and its complex transactions, and that it is the ‘ ‘ intention of the parties [which governs and] which must be ascertained from the entire contract, giving due consideration to the nature of the contract and the surrounding circumstances.” (3 N. Y. Jur., Assignments, § 8.) They assert that it was the intent of the parties here that the contract be assigned to the plaintiffs and that it is the intent which determines the right and power to assign.
With this principle of law, I agree. “ Doubtless, the general rule is that an executory contract not necessarily personal in its character, which can, consistent with the rights and interests of the adverse party, be sufficiently executed by the assignee, is assignable in the absence of agreement in the contract [citing cases] ” (New York Bank Note Co. v. Hamilton Bank Note Engraving & Print. Co., 180 N. Y. 280, 291, supra). It is that intent which must now be discovered, from a consideration and analysis of all of the credible proof in the case.
The plaintiffs place great stress upon the so-called White & Case draft (which was referred to in the May 2 agreement) to show that it was the intent of the parties that the plaintiffs were to be the purchasers. But it is plain that the White & Case draft was not fully incorporated in the May 2 agreement as signed. That agreement provided for the sale by the plaintiffs of the June Dairy stock, for which the plaintiffs received $25,000 in cash and, in addition thereto, they were to receive a complete release from June Dairy. The White & Case draft, on the other hand, provided that Jennings was to pay to June Dairy “ all such funds as shall have been withdrawn by Lim or at his direction from June Dairy for other than proper corporate purposes [which, while denied by the plaintiffs, were claimed by the defendants to be considerable] in such amount as shall be initially determined by ” specified accountants and verified by Jennings’ accountants, or adjudicated by arbi *337 tration. The White & Case draft further provided for the sale of the Long Branch operation to the plaintiffs or their nominee; that was superseded in the contract of May 2, the second paragraph of which was inconsistent therewith — the sale there provided for was expressly contemplated as being made to D’Ambrisi or his corporation, and only the terms and price thereof were as stated in the White & Case draft.
The parties vigorously disagree as to the reason for the inclusion of D’Ambrisi’s name in the final agreement and the part he was to play in the transaction.
The defendants assert that they would not deal with Jennings without D ’Ambrisi because Jennings had thus far shown himself to be incompetent and untrustworthy, while D’Ambrisi, on the other hand, had been a June Dairy employee for some 27 years, and that Foremost’s officers knew that, under D’Ambrisi’s management, the Long Branch plant had been well directed and well run. Thus, they maintain that D’Ambrisi was an indispensable factor in this agreement, insuring a profitable future relationship with Long Branch, since exclusive distributorship rights for many years were involved.
The plaintiffs argue that they would realize nothing from the expressed “ further consideration for the purchase and sale ” of the assets of their corporation, as specified in the May 2 contract, unless they themselves were to get the benefit of the sale of the Long Branch Division — albeit the transaction was to be in the name of D’Ambrisi or a corporation in which he was an officer and director. At first blush, the contention seems sound. But it strikes me — from an analysis of all of the credible proof — that the “ further consideration ” expressed in the writing was in reality recognized by the plaintiffs at the outset to be illusory — a deceptive means to achieve certain ends. It is indisputable that the plaintiffs’ personal corporation was in distress under the earlier contract, by which the assets of June Dairy were acquired by it, that subsequent investigation was claimed by the defendants to reveal that Jennings’ personal obligations in substantial sums were paid out of the funds of the corporation (to the detriment of the corporate creditors and its preferred stockholders, including the defendants), that the company was close to bankruptcy and that the appointment of a receiver was imminent, that the executive head of Foremost questioned Jennings’ financial responsibility, as well as his trustworthiness, and that the defendants had on two previous occasions rejected agreements under which the plaintiffs would acquire the Long Branch Division of June Dairy. In short, the plaintiffs were out or *338 on the way out as a permanent matter, and the defendants were intent upon their refusal to sell the Long Branch Division of June Dairy to the plaintiffs. They did agree to contract with D’Ambrisi or a corporation of which he is an officer and director. The defendants knew of D ’Ambrisi’s past record and success. It would seem that it was they who wanted D ’Ambrisi. In any case, it is certain that the defendants did not want Jennings. So they paid him $25,000, the sum which he had originally laid out, and he obtained an agreement of release, whatever the amount of his withdrawal from corporate funds for personal purposes and whatever adverse effect his operations had had upon the corporation. It seems to me that Jennings — realizing that the defendants were determined in their refusal to engage in any future deals with him — was willing to agree that D’Ambrisi be named in the contract, in the undisclosed expectation on Jennings’ part, that, by way of assignment, he would become the substitute for D ’Ambrisi, and thus achieve what he could not obtain directly. That was why, I think, on the very evening that the May 2 agreement was entered into, Jennings rushed to D’Ambrisi’s home and procured the assignment.
It is the plaintiffs’ further contention that it was the intent of the parties that the sale would be effectuated to Jersey Farm Products Corp., asserted to have been organized by the plaintiffs for the purpose, and in which company D’Ambrisi was an officer and director, and which was fully owned by the plaintiffs, and that when D’Ambrisi resigned his position as officer and director of the corporation, that was accomplished by the defendants in order to render “ impossible ” the performance of the May 2 agreement providing for the sale of the Long Branch business by the defendants to a corporation with which D’Ambrisi was connected as stated. I gather from the credible evidence, however, that Jennings used Jersey Farm Products Corp. as a receptacle into which to funnel June Dairy assets. In any event, the fallacy in the plaintiffs’ submission here is fourfold: (1) the May 2 contract said nothing about Jersey Farm Products Corp., and if it was the intention of the parties that it was that company with which the Long Branch transfer and distributorship agreement were to be made, it would have been quite simple to have said so; (2) nor did the May 2 docnment mention anything whatsoever about the plaintiffs’ interest— wholly or partly — in the D’Ambrisi corporation, and that, it seems to me, is a vital omission so far as the plaintiffs are concerned; (3) there is no proof that D’Ambrisi wanted to be *339 a director or an officer or that he knew that he was a director of this corporation or what specific offices he held therein; * and (4) there is no proof that he resigned his position in the company at the request or solicitation of the defendants. The evidence showed that there was some doubt as to D’Ambrisi’s awareness of what was going on during these transactions. D’Ambrisi himself did not testify in person upon the trial.** In an affidavit submitted by the defendants, on an intermediate application in this case, D’Ambrisi stated that he had examined the May 2 contract. However, on an examination before trial, D’Ambrisi testified that he had not seen any contract at all. Further, D’Ambrisi stated that he did not desire *340 to, and would not, buy the Long Branch project — whether because he was financially unable to make the deal or carry it out, or because he did not want to get in between the cross fire of Jennings on the one hand and Foremost on the other, or because he did not wish to undertake to rehabilitate what seemed to be a broken-down business, does not appear.
In any event, the defendants were not obligated, under the May 2 agreement, to enter into the future contract therein specified with any person, firm or corporation other than ‘ D ’Ambrisi or a corporation of which he is an officer and director.” Since D’Ambrisi has indicated that he is not willing to enter into that executory agreement with the defendants, a decree to compel the defendants to perform unilaterally will not be issued at the suit of the plaintiffs. They could not, over the defendants’ objection, place themselves in D’Ambrisi’s shoes and demand that the defendants enter into the agreement with them. For I find that the contract envisaged the Long Branch operation as an exclusive distributorship, that it involved extension of credit, and that it was based upon personal confidence, trust and faith, which obviously the defendants were not willing to supply to or place in Jennings. They had, they felt, been burnt once and were unwilling to submit to the hazard again. I hold that the contract in the case at bar, as in Paige v. Faure (229 N. Y. 114, supra), was intrinsically not assignable, and that the extrinsic circumstances showed an intent not to make it so.
There is one other basis that is projected by the plaintiffs for the use of D’Ambrisi’s name rather than that of Jennings’. Early in the trial, the plaintiffs submitted certain testimony to which the defendants objected. That evidence was to the effect that, on the morning of May 2, during the negotiations which resulted in the contract, the plaintiffs’ attorney, upon being shown the first draft of the agreement, asked ‘ ‘ Why have you got D’Ambrisi’s name in there, rather than Jennings ” He was told by Justin and Foremost’s counsel that they did not wish to have Jennings’ name appear in the agreement and that Jennings would be fully protected by the addition of the reference to the previous White & Case draft, which referred to “ Jennings or his nominee.” Thereupon, Jennings’ counsel “ was satisfied that Mr. D’Ambrisi’s name appeared purely as a nominee for Jennings,” and that the plaintiffs — by one means or another — were to be the actual purchasers. When trial counsel for the defendants objected to this proof as to “nominee,” “ on the ground that the complaint in this *341 ease is drawn on the theory that the plaintiff was assignee and not a nominee; and if there is an attempt here being made to change the theory of the cause of action, I think we should be put on notice of that,” the plaintiffs’ attorney responded, “ No, no, your Honor, we are not offering it with any such purpose as that. We are offering it simply to show the intention of the parties; that is all. ” I overruled the objection. It appears that, according to the plaintiffs, the only purpose for the elimination of Jennings’ name directly in the deal as contracted for was to avoid any disclosure thereof to the Federal court and the embarrassment that could arise in the bankruptcy proceeding if it were made known to the creditors and the court that the withdrawal of the application for a receiver and the dismissal of the chapter 10 proceedings involved a resale of a portion of the estate’s assets to the debtor.
The plaintiffs argue that their proof thus showed, among other things, the reason for the assignment to the plaintiffs by D ’Ambrisi, i.e., that he was the known nominee for them and was therefore under a duty to assign the contract to them. The plaintiffs also argue that the nominee proof was submitted to support the plaintiffs’ denial of the defendants’ assertion that the contract was intended to be personal to D ’Ambrisi. Logically considered, therefore, the nominee proof did not present a different theory of the action, and was admissible without amendment of the complaint. But, when the plaintiffs argue that the use of the nominee was for the purpose of not having Jennings’ name before the bankruptcy court in the endeavor to dispose of the proceeding, thereby keeping from that court the true picture of the sale of the business, they run afoul of a principle of law, especially invoked on the equity side of the court.
It is well settled that the courts will refuse to lend their assistance to a party seeking enforcement of a contract entered into in violation of existing law, despite the fact that the defendant also participated in the wrongdoing (McMullen v. Hoffman, 174 U. S. 639). As stated in Carrier v. Carrier (226 N. Y. 114, 123, motion for reargument denied, 226 N. Y. 712): “ They [the courts] will not stir a step in aid of an illegal scheme ”. And “ [i]t is an ancient and established maxim of equity jurisprudence that he who comes into equity must come with clean hands ” (Bishop v. Bishop, 257 F. 2d 495, 500, cert, denied 359 U. S. 914). “ The maxim has been held to include within its operation certain other maxims, to wit: ‘ No right of action can arise out of an immoral cause ’; No right of action can arise out of fraud or deceit ’; ‘A right cannot arise to any *342 one out of Ms own wrong ‘Both parties to the litigation being equally at fault, the defendant’s position is the stronger.’” (2 Pomeroy, Equity Jurisprudence [5th ed.], § 397, p. 90.)
The Supreme Court of the United States said, in Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co. (324 U. S. 806, 815) : “ This maxim necessarily gives wide range to the equity court’s use of discretion in refusing to aid the unclean litigant. It is ‘ not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.’ Keystone Driller Co. v. General Excavator Co., supra, [290 U. S.] 245, 246. Accordingly one’s misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.”
According to the plaintiffs’ claim, the parties used D’Ambrisi as a dummy, instead of maMng an open and direct contract with Jennings as the prospective purchaser, so as to withhold from the court and the other creditors that the debtor in effect had made a special undercover deal with its preferred stockholder, also one of the creditors. That was an attempt to perpetrate a fraud upon the court — and, whether or not illegal, it certainly must be held to have dirtied the hands of the participants. It was plainly offensive to the administration of justice and should not receive the approval of this court.
The Court of Appeals has unmistakably established the standard. Pattison v. Pattison (301 N. Y. 65) was a suit to impress a constructive trust upon real property which plaintiff had conveyed to defendant, his sister, upon her alleged oral promise to reconvey to him. It appeared that the purpose of the plaintiff in making the conveyance was his apprehension that a creditor would obtain a judgment against him and seize the property. The defendant promised to deed the property back to the plaintiff when the claim against him had been satisfied, gome years later, the debt was paid, but the defendant refused to reconvey. The court unanimously and bluntly held that ‘ ‘ equity will not afford relief, since plaintiff comes into court with unclean hands, but will leave the parties where it finds them” (p. 74), for “ [t]o allow such a plan to succeed would put a premium upon dishonorable conduct ” (p. 73).
Whether, in fact, the Federal court was misled is, I think, immaterial. But it is significant to note — insofar as the transcript of the proceedings there discloses — that counsel for the *343 defendants strenuously objected to Jennings’ continuance in the business and urged the immediate appointment of a receiver. After the making of the May 2 agreement, undenied reference was made to D’Ambrisi as if he were the principal in the deal. It was not until several sessions later, after Jennings and Justin had disagreed as to whether Jennings was the real party in interest, that the situation was somewhat hesitantly disclosed to the court — one side in an endeavor to persuade it to retain jurisdiction, the other side seeking dismissal of the bankruptcy proceeding and relegation of the parties to a plenary suit to resolve their differences.*
Thus, based upon the very facts as they are alleged by the plaintiffs, they have disqualified themselves from obtaining an adjudication in their favor, even if the defendants were equally guilty of the same scheme (Nebbia v. Nebbia, 111 N. Y. S. 2d 813, 816).
“ Moreover, the unconscionable character of a transaction need not be pleaded or set up as a defense. Whenever it is disclosed the court will of its own motion apply the maxim.” (Bishop v. Bishop, 257 F. 2d 495, 500, cert, denied 359 U. S. 914, supra.) In Renaud Sales Co. v. Davis (104 F. 2d 683, 685) the First Circuit held: “It is settled that the equitable maxim of unclean hands may be invoked even though the matter is not set up as a defense.”
In Gynex Corp. v. Dilex Inst, of Feminine Hygiene (85 F. 2d 103, 106) the Second Circuit held: “It was such inequitable conduct that neither plaintiff has come into court with clean hands and neither is entitled to any equitable relief. * * *
This issue [unclean hands] was not raised by the pleadings and, although called to the attention of the court below in argument, was put aside because as the court said: ‘ I should regard it as unfair to inject into the case in any such way any such issue without advance notice to the other side. ’ But this was not strictly a matter of defense. It was, instead, a matter calling for a refusal by a court of equity to be used in furtherance of a fraud upon the public. And so it need not be pleaded.”
To the same effect is the case of Libbey-Owens-Ford Glass Co. v. Sylvania Ind. Corp. (154 F. 2d 814, 815) where the Second Circuit held: “For it is quite clear that the defendant [defense?] of unclean hands need not have been pleaded, but, since it goes to the heart of the plaintiff’s case, may be taken up without affirmative claim therefor.”
*344 The consequence is that, whatever reason the respective parties may have had for contractually providing a sale to D’Ambrisi instead of to Jennings, the plaintiffs’ demand for specific performance must be rejected. Let me recapitulate:
(1) If, as claimed by the defendants, D ’Ambrisi was a trusted, satisfactory and successful employee of the defendants, and they would have nothing of Jennings, that emphasizes the nonassignability by D’Ambrisi of the contract, especially to J ennings.
(2) If, as claimed by the plaintiffs, D’Ambrisi was a dummy, whose name was to be used on the record for Jennings, so that the bankruptcy court would not be made aware of the private deal between debtor and its preferred stockholder and creditor, that causes the plaintiffs to be confronted with the admission of an attempted fraud upon the bankruptcy court, and brings them into this court with unclean hands.
(3) If, as perhaps Jennings thought, he could control D’Ambrisi, and, therefore, was satisfied to let him be the party named in the contract, the facts, as they developed, showed that D ’Ambrisi did not desire to be the purchaser, personally or by way of a corporation. Thus, the plaintiffs were unable to present to the defendants as the purchaser ‘1 D ’Ambrisi, or a corporation of which he is an officer and director ’ ’, as required in the contract sued upon.
I come now to that phase of the complaint which asks for an accounting of profits allegedly realized by the defendants, from the time of the refusal by them to make delivery of the Long Branch business to the plaintiffs and during the continued operation by the defendants of its affairs. It follows, of course, from my determination that the plaintiffs are not entitled to specific performance by reason of the nonassignability to them of the contract sued upon, that there is nothing for which the defendants are required to account to the plaintiffs.
Finally, the plaintiffs demand that, if they are denied relief in equity by way of specific performance, they be awarded damages for the defendants’ nonperformance. But there was no proof that the defendants refused to perform the contract in accordance with its tenor. The contract required the defendants to effectuate the sale to D’Ambrisi or to a corporation of which he is an officer and director — in short, that this contract was not assignable but was, in the sense specified, personal to D’Ambrisi. It was he who was not ready, able and willing to perform — and, therefore, there was not due performance by the plaintiffs in that regard. There was thus no breach of the contract by the defendants vis-a-vis the plaintiffs. As a conse *345 quence, the plaintiffs are not entitled to an award of damages. I need not, then, go into the question as to whether there was adequate proof of the damages claimed. And I note here that this is not a suit for or based upon a rescission, whereby the plaintiffs seek to put all the parties in status quo ante.
Accordingly, judgment is awarded the defendants dismissing the complaint on the merits.

 The annual report for 1956, filed with the New Jersey Secretary of State by Jersey Farm Products Corp. was signed on June 8, 1956 by the plaintiffs as president and secretary, respectively. Therein it is stated that D’Ambrisi is a director and vice-president and assistant secretary, with his terms of office expiring on June 26, 1956, the date of the next annual meeting of stockholders. Anna D’Ambrisi was neither an officer nor a director.
By letter dated May 23, 1956, addressed to the corporation “ Attention: Mr. Milton Jennings, President ”, D’Ambrisi writes: “I hereby resign as
Vice-President of Jersey Farm Products Corp. I likewise resign any other office or directorship which I may presently hold in this corporation. I will, however, continue to serve as Manager of the Long Branch operation.”
On the same date, Anna D’Ambrisi also wrote to the corporation as follows: “ I hereby resign any office or directorship which I may presently hold in Jersey Farm Products Corp. I will, however, continue to serve as Bookkeeper of the Long Branch operation ”.
In his examination before trial, D’Ambrisi demonstrated uncertainty as to just what positions he held in the corporation other than the vice-presidency.

 One matter on this score deserves mention. D’Ambrisi had been examined before trial, and his testimony there was available to the plaintiffs and utilized upon the trial. But D’Ambrisi is still an employee of the defendants and the plaintiffs stress the point that the defendants did not call D’Ambrisi as a witness on the trial before me. But it is well to note that the effect upon the trier of the facts of the failure of a party to call a witness under his control is not as broad as is generally thought. The correct rule — which I applied in resolving the issues of fact in this ease — is that which I had occasion to state in Mitler v. Friedeberg (32 MisC 2d 78, 90-91) as follows:
“ [T]he unexplained omission of that party to call the witness would (if justified under all the circumstances of the ease) warrant a trial tribunal sitting in this State in considering most strongly and favorably the evidence presented by the opposing party, which the testimony of the witness not produced might have contradicted or explained; but the failure to call the witness in and of itself does not constitute evidence, because such omission raises no presumption and is not proof of the facts (see Milio v. Railway Motor Trucking Co., 257 App. Div. 640). ’ The inference cannot take the place of evidence; it cannot supply a deficiency in the other party’s case nor can it be regarded as proof of any essential fact.’ (Laffin v. Ryan, 4 A D 2d 21, 26; see discussion by Hofstadter and Richter, ‘ Effect of Failure to call a Witness — New Rule Proposed ’, N. Y. L. J., editorial pages, June 4, 5 and 6, 1956.) ”

 None of the trial counsel for any of the parties before me participated in the preparation of the May 2 agreement or in the presentation of the matter to the bankruptcy court.